# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————————

No. 98-1830EA

———————————

| | | |
|---|---|---|
| Jim C, individually and as parent and next friend of J.C., and Susan C, individually and as parent and next friend of J.C., | * * * * * | |
| Appellees, | * * | |
| v. | * | |
| | * | On Appeal from the United |
| United States of America, | * | States District Court |
| | * | for the Eastern District |
| Intervenor on Appeal, | * | of Arkansas. |
| | * | |
| Atkins School District, and Arch Ford Education Service Cooperative, | * * * | |
| Defendants, | * * | |
| Arkansas Department of Education, | * * | |
| Appellant. | * | |

———————————

Submitted: January 14, 2000

Filed: December 22, 2000

———————————

Before WOLLMAN, Chief Judge, McMILLIAN, RICHARD S. ARNOLD, BOWMAN, BEAM, LOKEN, HANSEN, MORRIS SHEPPARD ARNOLD, MURPHY, and BYE, Circuit Judges.

_____

RICHARD S. ARNOLD, Circuit Judge, joined by WOLLMAN, Chief Judge, and
    McMILLIAN, HANSEN, MORRIS SHEPPARD ARNOLD, and MURPHY,
    Circuit Judges.


       Plaintiffs, parents of a child with autism, brought this suit against the defendant, the Arkansas Department of Education. They alleged that the defendant had failed to comply with its obligations under certain statutes, including Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. The defendant moved to dismiss the suit, asserting sovereign immunity, as recognized by the Eleventh Amendment. The District Court[1] denied the motion, holding that the abrogation provision of Section 504, 42 U.S.C. § 2000d-7(a)(1), was a valid exercise of Congress's power under Section 5 of the Fourteenth Amendment. On appeal, a panel of this Court reversed, holding that Section 504 could not be upheld as Section 5 legislation. Bradley v. Arkansas Department of Education, 189 F.3d 745, 756 (8th Cir. 1999). The panel then considered whether Arkansas had waived its sovereign immunity with respect to Section 504 by accepting federal funds. The panel held that there was no waiver, concluding that Section 504 was not a valid exercise of Congress's spending power because the conditions it placed on a State's receipt of federal funds were too broad and therefore coercive. Id. at 758. We granted plaintiffs' suggestion for rehearing en banc on the spending-power issue alone, vacating that portion of the panel's opinion and judgment. We hold that Section 504 is a valid exercise of Congress's spending power, and that Arkansas waived its immunity with respect to Section 504 suits by accepting federal funds. The judgment of the District Court, denying the State's motion to dismiss, will therefore be affirmed.

_____

    [1]The Hon. Garnett Thomas Eisele, United States District Judge for the Eastern District of Arkansas.

Section 504 of the Rehabilitation Act prohibits "any program or activity" that receives federal financial assistance from discriminating against a qualified individual with a disability. 29 U.S.C. § 794(a). The statute, in relevant part, defines "program or activity" as:

> all of the operations of --
>
> (1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or
>
> (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;
>
> . . . .
>
> any part of which is extended Federal financial assistance.

29 U.S.C. § 794(b). Under this definition, the State itself as a whole is not a program or activity. Rather, as we have previously noted, "only the department or agency which receives [or distributes] the aid is covered." Klinger v. Dep't of Corrections, 107 F.3d 609, 615 (8th Cir. 1997) (quoting S. Rep. No. 100-64, 100th Cong., 2d Sess. 4 (1988), reprinted in 1988 U.S.C.C.A.N. (Legislative History) 3, 6.[2] The acceptance of funds

---

[2]Klinger dealt with Title IX's definition of "program or activity," 20 U.S.C. § 1687, which is identical to the definition in Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(b). Both Title IX and Section 504 were amended by the Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 28 (1988), to add this definition of "program or activity."

by one state agency therefore leaves unaffected both other state agencies and the State as a whole.[3]

The Rehabilitation Act requires States that accept federal funds to waive their Eleventh Amendment immunity to suits brought in federal court for violations of Section 504. 42 U.S.C § 2000d-7. Since Section 504 covers only the individual agency or department that accepts or distributes federal funds, this waiver requirement is limited in the same way. By accepting funds offered to an agency, the State waives its immunity only with regard to the individual agency that receives them. A State and its instrumentalities can avoid Section 504's waiver requirement on a piecemeal basis, by simply accepting federal funds for some departments and declining them for others. The State is accordingly not required to renounce all federal funding to shield chosen state agencies from compliance with Section 504.

The defendant argues that Section 504's waiver requirement exceeds Congress's spending power by placing overly broad and therefore coercive conditions on federal funds. We disagree. Congress is empowered to "lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. "Incident to this power, Congress may attach conditions on the receipt of federal funds . . .." South Dakota v. Dole, 483 U.S. 203, 206 (1987). Specifically, Congress may require a waiver of state sovereign immunity as a condition for receiving federal funds, even though Congress could not order the waiver directly. College Savings Bank v. Florida

---

[3]If the entire state government were subject to Section 504 whenever any of its parts received federal funds, then subsection (b)(1)(B) would be superfluous; both the distributing and receiving state entities would be already covered under (b)(1)(A) whenever either received federal funds. Other circuits interpreting this definition of "program or activity" have come to the same conclusion. Lightbourn v. County of El Paso, Texas, 118 F.3d 421, 427 (5th Cir. 1997); Schroeder v. City of Chicago, 927 F.2d 957, 962 (7th Cir. 1991).

Prepaid Postsecondary Education Expense Board, 119 S. Ct. 2219, 2231 (1999). While it appears, as the defendant urges, that the "financial inducements" employed by Congress can become so "coercive as to cross the point where 'pressure turns into compulsion,' " that limit has not been crossed here. Id. (citations omitted).

To avoid the effect of Section 504 on the Arkansas Department of Education, the State would be required to sacrifice federal funds only for that department. This requirement is comparable to the ordinary quid pro quo that the Supreme Court has repeatedly approved; the State is offered federal funds for some activities, but, in return, it is required to meet certain federal requirements in carrying out those activities. See, e.g., Lau v. Nichols, 414 U.S. 563, 566-67 (1974) (upholding Congress's power to condition federal education funds on non-discrimination in the funded programs). In these cases, the Court has found no coercive interference with state sovereignty because the State could follow the " 'simple expedient' of not yielding. . .." State of Oklahoma v. United States Civil Service Commission, 330 U.S. 127, 143-44 (1947). Likewise here, the Arkansas Department of Education can avoid the requirements of Section 504 simply by declining federal education funds. The sacrifice of all federal education funds, approximately $250 million or 12 per cent. of the annual state education budget according to the 1999-2001 Biennial Budget, 28-29, would be politically painful, but we cannot say that it compels Arkansas's choice. Cf. New York v. United States, 505 U.S. 144, 168 (1992) ("By [employing the spending power to attach conditions on the States' receipt of federal funding], as by any other permissible method of encouraging a State to conform to federal policy choices, the residents of the State retain the ultimate decision as to whether or not the State will comply. If a State's citizens view federal policy as sufficiently contrary to local interests, they may elect to decline a federal grant.") The choice is up to the State: either give up federal aid to education, or agree that the Department of Education can be sued under Section 504. We think the Spending Clause allows Congress to present States with this sort of choice.

With regard to the requirements of Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 247 (1985), the Rehabilitation Act's waiver provision, 42 U.S.C. § 2000d-7(a)(1), provides a clear expression of Congress's "intent to condition participation in the program[ ] . . . on a State's consent to waive its constitutional immunity." See Lane v. Pena, 116 S. Ct. 2092, 2100 (1996); Little Rock School District v. Mauney, 183 F.3d 816, 831 (8th Cir. 1999). We hold, therefore, that Arkansas waived sovereign immunity, with respect to suits under Section 504 against the Department of Education, when it chose to participate in the federal spending program created by that Section.

The panel opinion took the position that the waiver required would cover all activities of the State, not just the activities of the department or departments receiving federal funds. As a matter of statutory interpretation, we disagree: for reasons we have given, Section 504's definition of "program or activity" is not that broad. We acknowledge that the waiver does cover all activities of the Department of Education, and not merely those activities specifically supported by Section 504 funds. We do not consider such a choice unconstitutionally "coercive." The State may take the money or leave it. Other than the vacated panel opinion in this case, we know of no authority holding any choice so coercive as to exceed the limits of the Spending Clause. Sovereign states are fully competent to make their own choice.

The judgment is affirmed.

BOWMAN, Circuit Judge, dissenting, joined by BEAM, LOKEN, and BYE, Circuit Judges.

I respectfully disagree with the Court's decision. I do so for two separate, independent reasons, either of which, in my view, requires reversal of the District Court. I state them briefly.

First, the financial inducement offered by Congress for the Arkansas Department of Education to waive its Eleventh Amendment immunity with respect to Rehabilitation Act claims is coercive. The Supreme Court explicitly has recognized that financial pressure applied by Congress may "pass the point at which 'pressure turns into compulsion.'" South Dakota v. Dole, 483 U.S. 203, 211 (1987) (quoting Steward Mach. Co. v. Davis, 301 U.S. 548, 590 (1937)). In Dole, the Court rejected the argument as to coercion on the ground that South Dakota would lose only 5% of its federal money for highways if South Dakota declined to raise the minimum drinking age to twenty-one as Congress wished. Inasmuch as the condition imposed by Congress placed only a small percentage of the state's federal money for highways at risk, "the argument as to coercion is shown to be more rhetoric than fact." Id.

In contrast, here we confront a Congressional directive that places at risk 100% of Arkansas's federal funding for education—some $250,000,000 a year at last report. This amount of money to support public education could not easily be replaced by Arkansas, and public education undoubtedly would suffer if Arkansas failed to yield the requested waiver of its Eleventh Amendment immunity. The money would have to be shifted from other needy portions of Arkansas's budget or raised by the imposition of additional taxes. Either course assuredly would present great difficulty. And either way, federal taxpayers in Arkansas would be deprived of the benefits of a return from the federal government to the state of a significant amount of the federal tax monies collected from Arkansans. Moreover, we should not be unmindful of how unpopular and potentially counter-productive it is to increase state taxes when federal taxes (especially when taken in combination with existing state and local taxes) are at a very high level, as they currently are and have been for many years.[1] In sum, the proportion of federal funds for education in Arkansas here placed at risk by the federal scheme (100%), the amount of those funds (some $250,000,000), and the difficulty of making

---

[1]For a scholarly explication of this point, see Lynn A. Baker, Conditional Federal Spending After Lopez, 95 Colum. L. Rev. 1911, 1935-39 (1995).

up for the loss of those funds if the State elects not to waive its Eleventh Amendment immunity with respect to Rehabilitation Act claims all lead to the conclusion that pressure has turned into compulsion and that the waiver given by the State is therefore unenforceable.

Second, as our Court held in a portion of the panel opinion not affected by the en banc proceedings in this case, § 504 of the Rehabilitation Act and its related abrogation clause do not abrogate the states' Eleventh Amendment immunity. That is so because the Rehabilitation Act imposes duties upon the states exceeding those commanded by the Fourteenth Amendment, and thus is beyond the power over the states given to Congress by § 5 of that amendment. For the panel's complete analysis of this point, see Bradley v. Arkansas Department of Education, 189 F.3d 745, 754-56 (8th Cir. 1999). The question then becomes whether Congress, in the guise of Spending Clause legislation, can achieve indirectly what it cannot constitutionally achieve directly. That is, can Congress get its way by presenting the states with the Hobson's choice of either waiving their Eleventh Amendment immunity from § 504 claims or foregoing all federal funds to support various traditional state activities such as education, highways, and the like? Professor Lynn A. Baker has brilliantly captured the essence of this question:

> So long as [Article I, which enumerates all the powers granted to Congress by the original Constitution] is not interpreted to grant Congress plenary power to regulate the states directly, the Tenth Amendment's reservation to the states of all powers not delegated to the federal government has content and significance. But if the Spending Clause is simultaneously interpreted to permit Congress to seek otherwise forbidden regulatory aims indirectly through a conditional offer of federal funds to the states, the notion of "a federal government of enumerated powers" will have no meaning.

Lynn A. Baker, Conditional Federal Spending After Lopez, 95 Colum. L. Rev. 1911, 1920 (1995) (footnote omitted).  As Professor Baker noted, Justice O'Connor has sounded the same theme:

> If the spending power is to be limited only by Congress' notion of the general welfare, the reality, given the vast financial resources of the Federal Government, is that the Spending Clause gives "power to the Congress to tear down the barriers, to invade the states' jurisdiction, and to become a parliament of the whole people, subject to no restrictions save such as are self-imposed."  This, of course, . . . was not the Framers' plan and it is not the meaning of the Spending Clause.

Dole, 483 U.S. at 217 (O'Connor, J., dissenting) (citation omitted) (quoting United States v. Butler, 297 U.S. 1, 78 (1936)).

For the majority of the Court in Dole, the proper way to limit the Spending Clause  (besides applying the coercion test) is to require, among other things, that any conditions placed on federal grants to the states be related "to the federal interest in particular national projects or programs."  Id. at 207 (quoting Massachusetts v. United States, 435 U.S. 444, 461 (1978) (plurality opinion)).  The Court found that this test was satisfied in Dole inasmuch as the condition imposed by Congress (raising the state's drinking age to twenty-one) was directly related to the federal interest in safe interstate travel, which the Court found to be "one of the main purposes for which [federal] highway funds are expended."[2]  Id. at 208.

The kind of finding made in Dole could not plausibly be made in this case.  Here, the condition (waiver of Eleventh Amendment immunity with respect to Rehabilitation

---

[2]Justice O'Connor would have found the condition "not sufficiently related to interstate highway construction" and therefore would have held the condition invalid. Dole, 483 U.S. at 214; see id. at 218.

Act claims) bears no direct relationship (indeed, not even a discernible relationship) to the purpose of most federal grants to the states for education. That purpose, broadly stated, is to improve the overall quality of education. Admittedly, fair, nondiscriminatory treatment for disabled persons is part of the total picture, but it is only a small part. Although it presumably would be permissible for Congress to condition the receipt of any grants it might make specifically for Rehabilitation Act purposes upon a waiver of state immunity from § 504 claims—a normal quid pro quo—it is not permissible to condition the receipt of other, unrelated federal grants for education upon such a waiver. Conditions on the receipt of federal funds always must "bear some relationship to the purpose of the federal spending; otherwise, of course, the spending power could render academic the Constitution's other grants and limits of federal authority." New York v. United States, 505 U.S. 144, 167 (1992) (citation omitted). Thus, because the condition imposed in this case is overbroad, going as it does to all federal funds received by the Arkansas Department of Education, no matter what the particular purpose of the funds, the State's waiver of its Eleventh Amendment immunity has not been validly exacted.

For either or both of the reasons outlined above, I would hold that plaintiffs' § 504 claim against the Arkansas Department of Education should be dismissed as barred by the Eleventh Amendment. Accordingly, I would reverse the decision of the District Court allowing the suit to go forward on this claim.

— — — — — — — — — —

Over the past several years, the Supreme Court in a series of cases has rigorously applied the constitutional prohibition against Congress's use of its Article I powers as a basis for abrogating the Eleventh Amendment immunity of the states. See Kimel v. Fla. Bd. of Regents, 528 U.S. 62 (2000) (holding that Age Discrimination in Employment Act did not validly abrogate states' Eleventh Amendment immunity from individual suits because abrogation exceeded Congress's authority under § 5 of

Fourteenth Amendment, and reiterating that no such authority exists under Article I); Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank, 527 U.S. 627 (1999) (holding that congressional attempt to abrogate states' sovereign immunity from patent infringement claims under Patent and Plant Variety Protection Remedy Clarification Act was invalid exercise of Article I commerce or patent powers and not justified under Fourteenth Amendment § 5 enforcement powers); Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666 (1999) (holding that Congress did not abrogate states' Eleventh Amendment immunity from suit under Trademark Remedy Clarification Act because Act identified no property right protected by Fourteenth Amendment, whose § 5 enforcement powers were only possible basis for purported abrogation); Seminole Tribe v. Florida, 517 U.S. 44 (1996) (holding, in seminal case, that Indian Gaming Regulatory Act could not abrogate states' sovereign immunity as exercise of Congress's power under Indian Commerce Clause because Article I powers could not circumvent Eleventh Amendment restrictions on Article III judicial power).

The Court's holdings in these cases reflect the rock-solid principle that Eleventh Amendment immunity trumps any exercise of the powers of Congress enumerated in the original Constitution; controlling weight must be given to the provision that became part of the Constitution later in time. I am struck, however, by how easy it would be, if the majority of our Court has decided this case correctly, for Congress to overcome this limitation on its power. By resort to the spending power (another Article I power, by the way), Congress could achieve indirectly the same abrogation of Eleventh Amendment immunity it could not achieve directly. Congress could do this by the simple expedient of coupling an abrogation provision with a provision conditioning the states' receipt of any or all federal funds upon the states' waiver of Eleventh Amendment immunity with respect to whatever sorts of claims Congress might specify. Given the financial and political reality within which state governments struggle to fund their operations adequately, most if not all of the states would yield. The same scenario could unfold with respect to other kinds of conditions on the states' receipt of federal

funds, with Congress achieving through the spending power ends it otherwise lacks the constitutional authority to pursue. Truly, the view of the Spending Clause taken by the majority of the Court in today's decision gives "power to the Congress to tear down the barriers, to invade the states' jurisdiction, and to become a parliament of the whole people, subject to no restrictions save such as are self-imposed." Butler, 297 U.S. at 78. It seems quite clear to me that the Framers never intended the Spending Clause to become an enabling provision for the otherwise unconstitutional exercise of federal power over the states. Yet this is precisely what today's decision ordains. If our Court will not take a hard look at the anomaly created by a "spending power über alles" mentality, perhaps the Supreme Court will.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.