Francisco GARCIA, Plaintiff–Appellant,

v.

**S.U.N.Y. HEALTH SCIENCES CENTER OF BROOKLYN; Stephen E. Fox, Ph.D., individually and in official capacity; Jacqueline S. Jakway, individually and in official capacity; Lorraine Terracina, Ph.D., individually and as Dean of Academic Affairs or her successor, Irwin M. Weiner, M.D., individually and as Dean of the College of Medicine or his successor; and Russell Miller, M.D., individually and as President of the State University of New York Health Sciences Center or his successor, Defendants–Appellees,**

and

**United States of America, Intervenor.**

**Docket No. 00–9223.**

United States Court of Appeals, Second Circuit.

Argued Jan. 25, 2001.

Decided Sept. 25, 2001.

Benjamin Z. Holczer, New York, NY, for Plaintiff–Appellant.

Mark Gimpel, Deputy Solicitor General (Eliot Spitzer, Attorney General of the State of New York; Deon J. Nossel, Assistant Solicitor General, of counsel), New York, NY, for Defendants–Appellees.

(William R. Yeomans, United States Assistant Attorney General, Civil Rights Division; Jessica Dunsay Silver; Seth M. Galanter; Washington, DC; for the United States as Intervenor.).

(Richard N. Simpson; Amy Ledoux; Sam R. Hananel; Ross, Dixon & Bell, L.L.P.; Washington, DC; S. Mark Goodman; Michael Hiestand; Arlington, VA; for Amicus Curiae Student Press Law Center on behalf of Plaintiff–Appellant.).

(Ogden A. Lewis; Daniel E. Wenner; Andrew H. Tannenbaum; Davis Polk & Wardwell; New York, NY; for Amici Curiae Access Now, The Center for Independence of the Disabled in New York, Disability Advocates, Judge David L. Bazelon Center for Mental Health Law, League for the Hard of Hearing, Mood Disorders Support Group, National Association of the Deaf, National Association of Protection and Advocacy Systems, The National Multiple Sclerosis Society–New York City Chapter, New York Association of Psychiatric Rehabilitation Services, New York Lawyers for the Public Interest, New York State Independent Living Council, and the State of Connecticut Office of Protection and Advocacy for Persons with Disabilities in Support of Plaintiff–Appellant.).

Before: WALKER, Chief Judge,
OAKES and PARKER, Circuit Judges.

JOHN M. WALKER, JR., Chief Judge:

This appeal stems from plaintiff-appellant Francisco Garcia's dismissal from a New York state medical school, the State University of New York Health Sciences Center at Brooklyn ("SUNY"), following his repeated failure to successfully complete the first-year medical school curriculum. After his dismissal, Garcia visited a

psychologist who subsequently diagnosed him as having attention deficit disorder and a learning disability. Relying on this diagnosis, Garcia sought readmission to SUNY. Although SUNY agreed to readmit Garcia, the two could not come to terms on how much of the first-year curriculum Garcia would have to retake and so Garcia never actually re-enrolled.

Instead, Garcia brought suit against defendants-appellees SUNY and various SUNY administrators and professors. Garcia's complaint alleged violations of (1) the free speech guarantee of the First Amendment, *see* U.S. Const. amend. I, (2) Title II of the Americans with Disabilities Act ("ADA"), *see* 42 U.S.C. § 12132, and (3) § 504 of the Rehabilitation Act, *see* 29 U.S.C. § 794a(a)(2). The complaint was dismissed by the United States District Court for the Eastern District of New York (Reena Raggi, *District Judge*). *See Garcia v. State Univ. of New York Health Sciences Ctr. at Brooklyn,* No. CV 97–4189, 2000 WL 1469551 (E.D.N.Y. Aug.21, 2000). We affirm the district court's judgment dismissing the complaint.

Among other issues, this appeal raises the following question of first impression: whether, consistent with the Eleventh Amendment's guarantee of state sovereign immunity, Title II of the ADA and § 504 of the Rehabilitation Act may be applied against non-consenting states in private suits seeking money damages.

## BACKGROUND

Garcia enrolled in the medical program at SUNY in the fall of 1993. His first year was not a successful one. Garcia failed four courses—gross anatomy, genetics, neuroscience, and epidemiology—and was in the lowest quartile in four others.

On May 12, 1994, after he received his failing mark in gross anatomy, Garcia and six other students who failed the course wrote a letter to the Chairman of the Department of Anatomy and Cell Biology, Dr. M.A.Q. Siddiqui. The letter requested a change in SUNY's policy that required them to retake the entire gross anatomy course over the summer. They sought instead to retake only the portions of the course they had failed. Their request was rejected.

Because of Garcia's poor grades, the First Year Grades Committee ("Grades Committee") recommended that he repeat the entire first year curriculum. Garcia appealed this decision to the Academic Promotions Committee ("Promotions Committee"). He denied that he had any "difficulty understanding concepts, solving problems or learning material" and stated that he could do better next year by working harder. The Promotions Committee upheld the Grades Committee's decision and required Garcia to repeat the first year curriculum.

Garcia's second year at SUNY (1994–95), which represented his second try at the first year curriculum, while somewhat improved, was still unsuccessful. He failed neuroscience again and barely passed embryology and histology/cell biology. This time the Grades Committee, after reviewing his academic record, recommended that he be dismissed. The Promotions Committee agreed and, in June 1995, Garcia was officially dismissed from SUNY.

Thereafter, Garcia arranged to be examined by an outside psychologist, Dr. Elizabeth Auricchio. She diagnosed him as having attention deficit disorder ("ADD") and a learning disability ("LD"). On approximately August 1, 1995, Garcia forwarded this diagnosis to SUNY with a request that he be readmitted and either have his neuroscience grade adjusted to a passing mark or be permitted to take a

make-up neuroscience exam scheduled for August 14, 1995.

On August 7, 1995, SUNY agreed to readmit Garcia, but refused to adjust his neuroscience grade or to permit him to sit for the August 14th make-up. Instead, SUNY conditioned Garcia's readmission on his (1) retaking the second and third trimesters of the first year curriculum, (2) working with SUNY's counselors to develop a study regimen to overcome his ADD and LD difficulties, and (3) undergoing a psychiatric evaluation and, if appropriate, treatment for his ADD.

Garcia states that "given his age (31 at the time), [his] financial situation and the humiliation he would face in explaining to family and friends that he was redoing the first year curriculum a third time, he rejected SUNY's proposal." He responded with a counter-proposal that he be permitted to advance to the second year curriculum without successfully completing neuroscience, and the following summer retake a neuroscience make-up course or make-up exam. SUNY rejected this proposal, explaining that,

> [a] student must successfully complete all basic science courses in the year in order to progress into the succeeding year. With your "Unsatisfactory" grade in Neuroscience, a major course in the first year curriculum, you are not eligible to take second year courses.

No further proposals were made, and Garcia was not readmitted to SUNY.

Garcia filed suit in federal district court in Brooklyn seeking $5 million in damages from SUNY and the other defendants; Garcia did not request injunctive relief. His complaint alleged (1) that his dismissal from SUNY in June 1995 was in retaliation for the May 1994 letter he had co-authored to Dr. Siddiqui opposing SUNY's requirement that he retake gross anatomy during that summer, and (2) that the defendants'

refusal to permit him to sit for the make-up neuroscience exam or to adjust his 1994–95 neuroscience exam to a passing mark violated both Title II of the ADA and § 504 of the Rehabilitation Act.

Judge Raggi granted summary judgment in favor of the defendants. She concluded, *inter alia*, that (1) the letter to Dr. Siddiqui did not involve speech on a matter of "public concern" and thus was not protected by the First Amendment, and (2) the accommodations Garcia sought under Title II and § 504 were unreasonable. This appeal followed.

While the appeal was pending, the Supreme Court handed down its decision in *Bd. of Tr. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). The Court held that Title I of the ADA, which prohibits the states, municipalities and other employers from "discriminat[ing] against a qualified individual with a disability because of th[at] disability . . . in regard to . . . terms, conditions, and privileges of employment," 42 U.S.C. § 12112(a), is not an effective abrogation of state sovereign immunity under the Eleventh Amendment. *See Garrett*, 121 S.Ct. at 967–68. In light of *Garrett*, we requested that the parties brief the question of whether Title II of the ADA and § 504 of the Rehabilitation Act validly abrogate state sovereign immunity. The United States intervened with respect to this question.

## DISCUSSION

I. First Amendment Retaliation

Garcia contends that in dismissing his First Amendment retaliation claim, the district court erroneously relied on the "public concern" doctrine to hold that his May 1994 letter to Dr. Siddiqui was not protected speech. Under the public concern doctrine, when "expression cannot be

fairly considered as relating to any matter of political, social or other concern to the community," but is simply a personal matter, it is not afforded First Amendment protection. *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

■ SUNY correctly concedes that the public concern doctrine does not apply to student speech in the university setting, *see Qvyjt v. Lin,* 932 F.Supp. 1100, 1108–09 (N.D.Ill.1996), but is reserved for situations where the government is acting as an employer, *see, e.g., Pickering v. Bd. of Educ.,* 391 U.S. 563, 574–75, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Hellstrom v. U.S. Dep't of Veterans Affairs,* 201 F.3d 94, 97 (2d Cir.2000); *Morris v. Lindau,* 196 F.3d 102, 109–10 (2d Cir.1999).

> The key to the First Amendment analysis of government employment decisions . . . is this: The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate.

*Waters v. Churchill,* 511 U.S. 661, 675, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality).

If every speech-related personnel decision were subjected to "intrusive oversight by the judiciary in the name of the First Amendment," effective government administration would be threatened and, in turn, the efficient provision of services and benefits would be jeopardized. *Connick,* 461 U.S. at 146, 103 S.Ct. 1684. Limiting First Amendment protection to speech related to matters of public concern ameliorates

this risk: it strikes " 'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs.' " *Id.* at 140, 103 S.Ct. 1684 (quoting *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731).

■ University students are not "employed" by the government, so the government's interest in functioning efficiently is "subordinate" to the students' interest in free speech. *Waters,* 511 U.S. at 675, 114 S.Ct. 1878. The need for the public concern doctrine to accommodate an elevated efficiency interest is therefore wholly absent. University students' speech deserves the same degree of protection that is afforded generally to citizens in the community, not the curtailed protection afforded government employees. *See Healy v. James,* 408 U.S. 169, 180, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972) (stating that "state colleges and universities are not enclaves immune from the sweep of the First Amendment" and the "First Amendment protections should apply with [no] less force on college campuses than in the community at large").

Despite conceding that the district court erred in applying the public concern doctrine to Garcia's case, SUNY argues that the dismissal of Garcia's claim should nonetheless be affirmed. SUNY contends that Garcia has failed to advance factual allegations supporting a prima facie case of retaliation. We agree.

■ "To survive summary dismissal, a plaintiff asserting [a] First Amendment retaliation claim[ ] must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the

protected speech and the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001); *see also Thaddeus–X v. Blatter,* 175 F.3d 378, 386–87 (6th Cir.1999) (en banc) (per curiam). Garcia has failed to meet the third showing. There is no material evidence of a causal relation between the May 1994 letter Garcia co-authored to Dr. Siddiqui and Garcia's dismissal from SUNY in June of 1995. In fact, the record belies his claim of retaliation: (1) some thirteen months passed between the date of the letter and his dismissal, (2) numerous SUNY officials on both the Grades Committee and the Promotions Committee approved his dismissal, (3) those officials did so based on substantial evidence of Garcia's persistent academic deficiencies, and (4) SUNY made a reasonable proposal in good faith that, if accepted, would have avoided Garcia's dismissal.

## II. Disability Discrimination Claims

### A. Title II of the ADA

■■ SUNY and the other defendants argue that Garcia's Title II claim for money damages against them is barred by the Eleventh Amendment. In *Dube v. State Univ. of New York,* we held that "[f]or Eleventh Amendment purposes, SUNY is an integral part of the government of the State [of New York] and when it is sued the State is the real party." 900 F.2d 587, 594 (2d Cir.1990) (internal quotation marks omitted). Insofar as Garcia is suing the individual defendants in their official capacities, he is seeking damages from New York, and the Eleventh Amendment therefore shields them to the same extent that it shields SUNY. *See, e.g., Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Insofar as Garcia is suing the individual defendants in their individual capacities,

neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials. *See Walker v. Snyder,* 213 F.3d 344, 346 (7th Cir.2000) (Title II), *cert. denied,* 531 U.S. 1190, 121 S.Ct. 1188, 149 L.Ed.2d 104 (2001); *Alsbrook v. City of Maumelle,* 184 F.3d 999, 1005 n. 8 (8th Cir.1999) (en banc) (Title II); *Calloway v. Boro of Glassboro Dep't of Police,* 89 F.Supp.2d 543, 557 (D.N.J.2000) (Title II and § 504) (collecting similar cases); *Montez v. Romer,* 32 F.Supp.2d 1235, 1240–41 (D.Colo.1999) (Title II and § 504).

### 1. Eleventh Amendment Principles

The Eleventh Amendment of the Federal Constitution provides in relevant part:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State. . . .

U.S. Const. amend. XI. On its face, the Eleventh Amendment does not reveal its applicability to the case at hand, for Garcia is not bringing suit against New York as a "Citizen of another State." *See Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (stating "the text of the Amendment would appear to restrict only the Article III diversity jurisdiction of the federal courts").

■■ Yet, as the Supreme Court has confirmed for over a century, *see Hans v. Louisiana,* 134 U.S. 1, 13, 10 S.Ct. 504, 33 L.Ed. 842 (1890), the significance of the Eleventh Amendment is not what it provides in its text, but the larger "background principle of state sovereign immunity" that it confirms. *Seminole Tribe,* 517 U.S. at 72, 116 S.Ct. 1114. "The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Garrett,* 121 S.Ct. at 962.

[11] This guarantee is not absolute. Congress may abrogate the "immunity when it both unequivocally intends to do so and 'act[s] pursuant to a valid grant of constitutional authority.' " *Id.* at 962 (quoting *Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000)). With respect to Title II of the ADA, it is clear that the Congress fully intended to abrogate state sovereign immunity. *See* 42 U.S.C. § 12202 ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of this chapter."). What is unresolved, however, is whether Title II was enacted pursuant to a grant of constitutional authority that empowers Congress to abrogate state sovereign immunity.

In enacting Title II, Congress purported to rely on its authority under both the Commerce Clause of Article I and § 5 of the Fourteenth Amendment. *See* 42 U.S.C. § 12101(b)(4) (invoking the "sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities"). To the extent that Title II rests on Congress's authority under the Commerce Clause, it cannot validly abrogate state sovereign immunity. This is because "Congress may not … base its abrogation of the States' Eleventh Amendment immunity upon the powers enumerated in Article I." *Garrett,* 121 S.Ct. at 962; *see also Seminole Tribe,* 517 U.S. at 72–73, 116 S.Ct. 1114 ("The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction.").

"Section 5 of the Fourteenth Amendment, however, does grant Congress the authority to abrogate the States' sovereign immunity." *Kimel,* 528 U.S. at 80, 120 S.Ct. 631. Thus, if Title II is a valid exercise of Congress's § 5 power, then nonconsenting states may be hailed into federal court by private individuals seeking money damages. *See Garrett,* 121 S.Ct. at 962. We turn our attention to this critical issue.

2. Title II and § 5 of the 14th Amendment

Section 5 of the Fourteenth Amendment authorizes Congress to " 'enforce,' by 'appropriate legislation' the constitutional guarantee that no State shall deprive any person of 'life, liberty or property, without due process of law,' nor deny any person 'equal protection of the laws.' " *City of Boerne v. Flores,* 521 U.S. 507, 517, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). When operating under § 5, Congress may prohibit conduct that itself violates the Fourteenth Amendment's substantive guarantees. Congress may also remedy or deter violations of these guarantees by "prohibiting a somewhat broader swath of conduct" than is otherwise unconstitutional, *Garrett,* 121 S.Ct. at 963 (internal quotation marks and citations omitted), subject to the requirement that there be "congruence and proportionality between the [violation] to be prevented or remedied and the means adopted to that end." *City of Boerne,* 521 U.S. at 520, 117 S.Ct. 2157. Congress may go no further, however, for to do so would work a substantive redefinition of the guarantees of the Fourteenth Amendment, and Congress "has been given [only] the power 'to enforce,' not the power to determine *what constitutes* a constitutional violation." *Kimel,* 528 U.S. at 81, 120 S.Ct. 631 (citations omitted) (emphasis in original); *see College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S.

666, 672, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999) ("[T]he term 'enforce' [in § 5] is to be taken seriously—. . . the object of valid § 5 legislation must be the carefully delimited remediation or prevention of constitutional violations.").

We turn to the specific question of whether Title II of the ADA is within the ambit of Congress's authority under § 5. Where disability discrimination is at issue, the Fourteenth Amendment only proscribes government conduct for which there is no rational relationship between the disparity of treatment and some legitimate governmental purpose. *See Garrett*, 121 S.Ct. at 963–64; *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 442–47, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Indeed, "so long as [a state's disparate] actions" are rationally related to a legitimate purpose, no Fourteenth Amendment violation is presented even if the actions are done "quite hard headedly" or "hardheartedly." *Garrett*, 121 S.Ct. at 964.

Several baseline considerations are applied under the Fourteenth Amendment to determine whether such a rational relationship in fact exists. First, the classification is permissible so long as "there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *See Heller v. Doe*, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (internal quotation marks and citations omitted). Second, "[a] State . . . has no obligation to produce evidence to sustain the rationality of a statutory classification." *Id.* "A statute is presumed constitutional and [t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." *Id.* (internal citation and quotation marks omitted). And finally, because "[t]he problems of government are practical ones and may justify, if they do not require, rough accommodations," the fit between the classification and the asserted government justification may be "imperfect" and may "in practice . . . result[ ] in some inequality." *Id.* at 321, 113 S.Ct. 2637 (internal quotation marks omitted).

Assessing the strictures of Title II against these baselines, the extent to which Title II is neither congruent nor proportional to the proscriptions of the Fourteenth Amendment becomes apparent. Consider Title II's requirement (as implemented through the DOJ regulations, *see* 42 U.S.C. § 12134) that a state make reasonable modifications in its programs, services or activities, *see* 28 C.F.R. §§ 35.130(b)(3)-(8), for "qualified individual[s] with a disability," *id.;* 42 U.S.C. § 12131(2), unless the state can establish that the modification would work a fundamental alteration in the nature of the program, service, or activity, *see* 28 C.F.R. § 35.130(b)(7). While the absence of a reasonable accommodation would be permissible under the Fourteenth Amendment so long as there were *any* rational basis for the absence, this provision of Title II allows but a single basis for not providing the accommodation: a showing that a fundamental alteration in the nature of the program, service, or activity would occur. *See Thompson v. Colorado*, 258 F.3d 1241, 1252 (10th Cir.2001) ("In contrast to the Equal Protection Clause prohibition on invidious discrimination against the disabled and irrational distinctions between the disabled and the nondisabled, Title II requires public entities to recognize the unique position of the disabled and to make favorable accommodations on their behalf.").

Moreover, whereas under the Fourteenth Amendment the absence of an accommodation would be presumptively permissible with the burden of challenging it

squarely on the plaintiff, Title II shifts the burden of proof onto the state to defend the absence. Indeed, this burden shift is consistent with the elevated scrutiny generally applied to suspect classifications such as race and nationality, suggesting that Title II is working a substantive elevation in the status of the disabled in equal protection jurisprudence. *See Garrett*, 121 S.Ct. at 967 ("[Title I of the ADA] . . . makes it the employer's duty to prove that it would suffer [an undue burden], instead of requiring (as the Constitution does) that the complaining party negate reasonable bases for the employer's decision."); *cf. Kimel*, 528 U.S. at 87–88, 120 S.Ct. 631 ("Measured against the rational basis standard of our equal protection jurisprudence, the ADEA plainly imposes substantially higher burdens on state employers. . . . [T]he Act's substantive requirements nevertheless remain at a level akin to our heightened scrutiny cases . . . .").

Finally, while the Fourteenth Amendment countenances inequality in the treatment of the disabled as long as the disparate treatment is rationally related to a legitimate government end, Title II's requirement that state governments make reasonable modifications is far broader: the eradication of unequal effects. Specifically, Title II focuses on disparate effects divorced from any inquiry into intent. *See generally* Roger C. Hartley, *The New Federalism and the ADA: State Sovereign Immunity from Private Damage Suits Af-*

*ter* Boerne, 24 N.Y.U. Rev. L. & Soc. Change 481, 481–82 & n. 7 ("No other civil rights statute so aggressively roots out needless impediments to full participation in the mainstream of American economic and social life."). Even in cases involving suspect classifications subject to heightened scrutiny under the Fourteenth Amendment, disparate effects alone are insufficient to establish an equal protection violation. *See Garrett*, 121 S.Ct. at 967 (citing *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)); *see also Alsbrook*, 184 F.3d at 1009 (stating that "it cannot be said that Title II identifies or counteracts particular state laws or specific state actions which violate the Constitution. Title II targets *every* state law, policy, or program"); *cf. City of Boerne*, 521 U.S. at 535, 117 S.Ct. 2157 ("In most cases, the state laws to which RFRA applies are not ones which will have been motivated by religious bigotry.").

Although we find that Title II in its entirety exceeds Congress's authority under § 5, this conclusion does not end our inquiry as to whether Title II validly abrogates state sovereign immunity. This is because Title II need only comport with Congress's § 5 authority to the extent that the title allows private damage suits against states for violations.

 Title II itself is silent as to the parameters of when a monetary recovery may be had.[1] *See* 42 U.S.C. § 12133. In-

---

1. This differs from Title I of the ADA which provided for monetary recovery for all violations of the provision. For example, while compensatory damages were available only for disparate treatment violations under Title I, *see* 42 U.S.C. § 1981a(a)(2), back pay was expressly available for all Title I violations (i.e., both disparate treatment and disparate impact violations), *see* 42 U.S.C. § 12117(a) (incorporating Title VII's provision of back-pay damage awards for both disparate treatment and disparate impact violations).

Thus, for it to validly abrogate state sovereign immunity, Title I, measured as a whole, had to target in a "congruent and proportional" manner conduct otherwise proscribed by the Fourteenth Amendment. *Garrett*, 121 S.Ct. at 963 ("[Section] 5 legislation reaching beyond the scope of § 1's actual guarantees must exhibit 'congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.' "). The same was true for the Age Discrimination in Employment Act of 1967. *See* 29 U.S.C.

stead, Title II simply incorporates the remedial scheme of the Rehabilitation Act of 1973, *see* 29 U.S.C. § 794a(a)(2) (incorporated into Title II by 42 U.S.C. § 12133), which in turn incorporates the remedial scheme of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq. See Ferguson v. City of Phoenix*, 157 F.3d 668, 673 (9th Cir.1998). And significantly, Title VI's remedial scheme includes a judicially implied private cause of action. *See Guardians Ass'n v. Civil Serv. Comm'n, N.Y.C.*, 463 U.S. 582, 594–95, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983). Thus, by referencing Title VI's remedial scheme, Title II (and § 504 of the Rehabilitation Act) incorporate an implied private right of action.

[21] This is significant because, when operating in the realm of judicially implied private rights of action, courts "have a measure of latitude to shape a sensible remedial scheme that best comports with the statute." *Gebser v. Lago Vista Independent Sch. Dist.*, 524 U.S. 274, 284–85, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) ("Because Congress did not expressly create a private right of action under Title IX, the statutory text does not shed light on the scope of available remedies."). We believe this latitude allows us to restrict the availability of Title II monetary suits against the states in a manner that is consistent with Congress's § 5 authority, and that thereby validly abrogates state sovereign immunity from private monetary suits under Title II. Indeed, since Congress expressly intended to abrogate the states' sovereign immunity under Title II, *see* 42 U.S.C. § 12202, it is particularly appropriate that we "fashion the scope of [the] implied right in a manner" that effec-

tuates this aim and, at the same time, does not offend the Constitution. *Gebser*, 524 U.S. at 284, 118 S.Ct. 1989; *see also Franklin v. Gwinnett County Publ. Schs.*, 503 U.S. 60, 66, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) ("[A]lthough we examine the text and history of a statute to determine whether Congress intended to create a right of action, we presume the availability of all *appropriate* remedies unless Congress has expressly indicated otherwise." (emphasis added) (citations omitted)). Moreover, to do otherwise would lead to the following anomalous result: Congress passing a law that leaves the courts responsible for establishing the contours of the remedial scheme, only to have the courts adopt a scheme that compels a conclusion that the statute exceeds Congress's constitutional authority. *Cf. Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 465–66, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (counseling that courts should avoid interpretations that would render a statute unconstitutional).

The question, therefore, is how Title II monetary claims against the states can be limited so as to comport with Congress's § 5 authority. The answer, we believe, is to require plaintiffs bringing such suits to establish that the Title II violation was motivated by discriminatory animus or ill will based on the plaintiff's disability. Government actions based on discriminatory animus or ill will towards the disabled are generally the same actions that are proscribed by the Fourteenth Amendment—i.e., conduct that is based on irrational prejudice or wholly lacking a legitimate government interest. *See* James Leonard, *A Damaged Remedy: Disability Discrimination Claims against State En-*

§§ 630(b) & 633a(c); *see, e.g., Wheeler v. McKinley Enters.*, 937 F.2d 1158, 1162 (6th Cir.1991) ("Where a plaintiff proves that he was discharged because of his age in violation of the ADEA, he is entitled to recover, at a minimum, any back pay lost as a proximate result of the violation."); *see also Kimel*, 528 U.S. at 69, 120 S.Ct. 631.

*tities under the Americans with Disabilities Act after* Seminole Tribe *and* Flores, 41 Ariz. L.Rev. 651, 727–37 (1999).

We believe that adopting any lesser culpability standard for Title II monetary suits against states would do little to achieve the congruence and proportionality required under § 5 of the Fourteenth Amendment. The point is made clear by consideration of the next lower culpability standard available: allowing monetary awards upon a showing of an intentional or willful violation of Title II itself. Simply requiring a "knowing" violation of Title II would still leave states subject to monetary liability for the full spectrum of conduct proscribed by the title even though, as we have already discussed, these proscriptions far exceed the authority afforded Congress under § 5. In other words, only requiring proof of an intentional or willful violation would still leave state governments subjected to monetary liability for engaging in conduct that is constitutionally permissible.

While we hold that a private suit for money damages under Title II of the ADA may only be maintained against a state if the plaintiff can establish that the Title II violation was motivated by either discriminatory animus or ill will due to disability, we recognize direct proof of this will often be lacking: smoking guns are rarely left in plain view. To establish discriminatory animus, therefore, a plaintiff may rely on a burden-shifting technique similar to that adopted in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), or a motivating-factor analysis similar to that set out in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 252–258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

To be sure, both the *McDonnell Douglas* and *Price Waterhouse* approaches will lessen a plaintiff's difficulty in establishing

animus relative to what would be demanded under traditional rational basis review, which requires that a plaintiff disprove the existence of any legitimate government justification. However, since both the *McDonnell Douglas* and *Price Waterhouse* approaches center on ferreting out injurious irrational prejudice, which after all is the concern of the Fourteenth Amendment where the disabled are concerned, and since both leave the ultimate burden of proof for establishing animus on the plaintiff, we believe they comport with Congress's enforcement authority under § 5. *See Kimel,* 528 U.S. at 81, 120 S.Ct. 631 ("Congress' § 5 power is not confined to the enactment of legislation that merely parrots the precise wording of the Fourteenth Amendment."); *see also City of Boerne,* 521 U.S. at 532, 117 S.Ct. 2157 ("Preventive measures prohibiting certain types of [state] laws may be appropriate when there is reason to believe that many of the [state] laws affected by the congressional enactment have a significant likelihood of being unconstitutional.").

Having determined that a showing of discriminatory animus or ill will based on disability is necessary to recover damages under Title II in a private action against a state, we turn to the facts of the instant case. Garcia's allegations are devoid of any contention that SUNY or the other defendants were motivated by irrational discriminatory animus or ill will based on his alleged learning disability. The crux of Garcia's claim is simply that SUNY denied him the accommodations he sought, namely allowing him to take "an already scheduled Neuroscience make-up exam" after he had twice failed the course or adjusting his neuroscience grade to a passing mark.

Because Garcia's Title II claim does not allege discriminatory animus or ill will

based on his purported disability, we affirm the district court's grant of summary judgment dismissing it.

### B. Section 504 of the Rehabilitation Act

Garcia alleges that in denying him the reasonable accommodations he sought following his dismissal from the medical program, SUNY and the other defendants also violated § 504 of the Rehabilitation Act. 29 U.S.C. § 794(a). Section 504 provides in pertinent part that,

> [n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

*Id.* SUNY does not dispute that at the time of the purported violation it was receiving federal financial assistance.

 Because § 504 of the Rehabilitation Act and Title II of the ADA offer essentially the same protections for people with disabilities,[2] *see Randolph v. Rodgers,* 170 F.3d 850, 858 (8th Cir.1999), our conclusion that Title II of the ADA as a whole exceeds Congress's authority under § 5 of

the Fourteenth Amendment applies with equal force to § 504 of the Rehabilitation Act.[3] However, unlike Title II of the ADA, § 504 was enacted pursuant to Congress's authority under the Spending Clause of Article I. *See* U.S. Const. art. I, § 8, cl. 1.

 When providing funds from the federal purse, Congress may require as a condition of accepting those funds that a state agree to waive its sovereign immunity from suit in federal court. *See College Savings Bank,* 527 U.S. at 686–87, 119 S.Ct. 2219; *see also South Dakota v. Dole,* 483 U.S. 203, 207, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987). Here, Garcia argues that § 2000d–7 of Title 42 operates as such a condition. Section 2000d–7 provides in pertinent part that,

> [a] State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal Court for a violation of Section 504 of the Rehabilitation Act of 1973.

 While we agree with Garcia that this provision constitutes a clear expression of Congress's intent to condition acceptance of federal funds on a state's waiver of its Eleventh Amendment immunity, that conclusion alone is not sufficient

---

**2.** Indeed, the most significant distinction between Title II of the ADA and § 504 of the Rehabilitation Act is their reach. While Title II applies to all state and municipal governments, § 504 applies only to those government agencies or departments that accept federal funds, and only those periods during which the funds are accepted. *See Jim C. v. United States,* 235 F.3d 1079, 1081 (8th Cir. 2000) (en banc) ("A State and its instrumentalities can avoid § 504's waiver requirement on a piecemeal basis, by simply accepting federal funds for some departments and declining them for others.").

**3.** In *Kilcullen v. New York State Dep't of Labor,* 205 F.3d 77, 78–81 (2d Cir.2000), we relied on the legislative history of Title I of the ADA to hold that the employment provisions

of the Rehabilitation Act were valid exercises of congressional authority under § 5 of the Fourteenth Amendment. *See id.* at 82 ("As Congress included identical unequivocal abrogation provisions in the ADA and the Rehabilitation Act, and as [Title I of] the ADA and Section 504 of the Rehabilitation Act impose identical obligations upon employers, the validity of abrogation under the twin statutes presents a single question for judicial review."). However, *Kilcullen* has since been implicitly abrogated by the Supreme Court's decision in *Garrett,* 121 S.Ct. at 965 ("The legislative record of [Title I of] the ADA, however, simply fails to show that Congress did in fact identify a pattern of irrational state discrimination in employment against the disabled.").

for us to find that New York actually waived its sovereign immunity in accepting federal funds for SUNY. *But see Jim C. v. United States*, 235 F.3d 1079, 1082 (8th Cir.2000) (en banc). As the Supreme Court instructed in *College Savings Bank*,

> [t]here is a fundamental difference between a State's expressing unequivocally that it waives its immunity and Congress's expressing unequivocally its intention that if the State takes certain action [e.g., accepting federal funds] it shall be deemed to have waived that immunity.

*College Savings Bank*, 527 U.S. at 680–81, 119 S.Ct. 2219. As is the case with the waiver of any constitutional right, an effective waiver of sovereign immunity requires an "intentional relinquishment or abandonment of a *known* right or privilege." *Id.* at 682, 119 S.Ct. 2219 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)) (emphasis added); *see also College Savings Bank*, 527 U.S. at 682, 119 S.Ct. 2219 ("State sovereign immunity, no less than the right to trial by jury in criminal cases, is constitutionally protected."); *see also McGinty v. New York*, 251 F.3d 84, 95 (2d Cir.2001) (noting "stringent" standard for finding waiver of state sovereign immunity). And in assessing whether a state has made a knowing and intentional waiver, the Supreme Court has instructed that "every reasonable presumption against waiver" is to be indulged. *College Savings Bank*, 527 U.S. at 682, 119 S.Ct. 2219 (internal quotation marks omitted).

 Turning to the instant case, we are unable to conclude that New York in fact waived its sovereign immunity against suit under § 504 when it accepted federal funds for SUNY. At the time that New York accepted the conditioned funds, Title II of the ADA was reasonably understood to abrogate New York's sovereign immunity under Congress's Commerce Clause authority. Indeed, the ADA expressly provided that "[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation . . . ." 42 U.S.C. § 12202. Since, as we have noted, the proscriptions of Title II and § 504 are virtually identical, a state accepting conditioned federal funds could not have understood that in doing so it was actually abandoning its sovereign immunity from private damages suits, *College Savings Bank*, 527 U.S. at 682, 119 S.Ct. 2219, since by all reasonable appearances state sovereign immunity had already been lost,[4] *see Kilcullen*, 205 F.3d at 82.

Accordingly, Garcia's § 504 damage claim against New York fails because New

---

4. We recognize that an argument could be made that if there is a colorable basis for the state to suspect that an express congressional abrogation is invalid, then the acceptance of funds conditioned on the waiver might properly reveal a knowing relinquishment of sovereign immunity. This is because a state deciding to accept the funds would not be ignorant of the fact that it was waiving its possible claim to sovereign immunity.

Even supposing such an argument to have merit, we would still conclude that New York did not waive its sovereign immunity here. This is because throughout the entire period involved in this dispute during which SUNY was accepting federal funds—September 1993 until August 1995—even the most studied scholar of constitutional law would have had little reason to doubt the validity of Congress's asserted abrogation of New York's sovereign immunity as to private damage suits under Title II. *Compare Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 19–20, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989) (plurality opinion) (holding that Interstate Commerce Clause granted Congress the power to abrogate state sovereign immunity), *with Seminole Tribe*, 517 U.S. at 72–73, 116 S.Ct. 1114 (1996) (expressly "overruling *Union Gas*" and holding that "Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction" by the Eleventh Amendment). *Compare also Katzenbach v.*

York had not knowingly waived its sovereign immunity from suit.[5]

### C. Related Observations

■ Two final points deserve mention. First, prior to today, we have held that a plaintiff may recover money damages under either Title II of the ADA or § 504 of the Rehabilitation Act upon a showing of a statutory violation resulting from "deliberate indifference" to the rights secured the disabled by the acts. *Bartlett v. New York State Bd. of Law Examiners,* 156 F.3d 321, 331 (2d Cir.1998), *vacated on other grounds by* 527 U.S. 1031, 119 S.Ct. 2388, 144 L.Ed.2d 790 (1999); *see also Duvall v. County of Kitsap,* 260 F.3d 1124, 1138–42 (9th Cir.2001). Although today's decision alters that holding by requiring proof of discriminatory animus or ill will for Title II damage claims brought against states, nothing we have said affects the applicability of the deliberate indifference standard to Title II claims against non-state governmental entities. Moreover, deliberate indifference remains the necessary showing

for § 504 claims since the Rehabilitation Act was enacted pursuant to Congress's Spending Clause authority and therefore does not require that damage remedies be tailored to be congruent and proportional to the proscriptions of the Fourteenth Amendment.[6]

■ Second, our holding that private damage claims under Title II require proof of discriminatory animus or ill will based on disability does not affect Title II's general applicability to the states, *see Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 555–57, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1984), as no such challenge was raised in this appeal, *cf. Thompson,* 258 F.3d at 1255 n. 11. Thus, actions by private individuals for injunctive relief for state violations of Title II have not been foreclosed by today's decision, *see Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *see also Garrett,* 121 S.Ct. at 968 n. 9.

### CONCLUSION

We have carefully considered the plaintiff's remaining contentions and find them

*Morgan,* 384 U.S. 641, 651–52 n. 10, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966) (suggesting in dicta that Congress can increase the substantive protections of the Fourteenth Amendment under its § 5 authority), *with City of Boerne,* 521 U.S. at 527–29, 117 S.Ct. 2157 (1997) (stating that "[t]here is language in ... *Katzenbach v. Morgan* ... which could be interpreted as acknowledging a power in Congress to enact legislation that expands the rights contained in § 1 of the Fourteenth Amendment" but holding that, in fact, no such authority exists).

**5.** Several of our sister circuits have held that a state's acceptance of federal funds constitutes a waiver of its sovereign immunity from suit under § 504 of the Rehabilitation Act. *See, e.g., Jim C.,* 235 F.3d at 1082; *Clark v. California,* 123 F.3d 1267, 1271 (9th Cir. 1997). These cases are unpersuasive because they focus exclusively on whether Congress clearly expressed its intention to condition waiver on the receipt of funds and whether

the state in fact received the funds. None of these cases considered whether the state, in accepting the funds, believed it was actually relinquishing its right to sovereign immunity so as to make the consent meaningful as the Supreme Court required in *College Savings Bank,* 527 U.S. at 682, 119 S.Ct. 2219.

**6.** Where Spending Clause legislation is concerned, the Supreme Court has generally adopted deliberate indifference as the necessary showing for private damage recoveries. *See, e.g., Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 643–47, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999); *Gebser,* 524 U.S. at 290–91, 118 S.Ct. 1989. Adoption of this standard has been based on a general recognition that "Congress surely did not intend for federal moneys to be expended to support the intentional actions it sought by statute to proscribe." *Franklin,* 503 U.S. at 75, 112 S.Ct. 1028; *Guardians Ass'n,* 463 U.S. at 597–99, 103 S.Ct. 3221.

without merit. Accordingly, the judgment of the district court dismissing the action is affirmed.

Each side to bear its own costs for this appeal.