Wayne L. ATWOOD, et al., on behalf of themselves and those similarly situated, Plaintiffs,

v.

The Hon. Thomas J. VILSACK, et al., Defendants.

No. 4:02 CV 90359.

United States District Court, S.D. Iowa, Central Division.

Sept. 30, 2004.

**990**

Patrick E. Ingram, Iowa City, IA, Randall C. Wilson, Des Moines, IA, for Plaintiffs.

Gordon E. Allen, Des Moines, IA, for Defendants.

## ORDER ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

PRATT, District Judge.

On July 23, 2002, numerous individuals detained pursuant to Iowa Code Chapter 229A filed a Complaint against the Defendants, seeking equitable and injunctive relief for: 1) denial of speedy justice and imposition of double jeopardy; 2) unnecessarily harsh and coercive conditions of confinement; 3) detention in contravention of statute; 4) failure to provide a therapeutically appropriate pre-commitment environment; 5) discriminatory treatment contravening the Americans with Disabilities Act; 6) denial of bail; 7) denial of individualized risk assessment and placement; and 8) denial of due process. The matter was certified as a class action in June 2003. Before the Court are Plaintiffs' Motion for Summary Judgment (Clerk's No. 45) and Plaintiffs' Motion to Certify the bail entitlement issue to the Iowa Supreme Court (Clerk's No. 69). Defendants have resisted the summary judgment motion and the matter is fully submitted.

## I. FACTS

Plaintiffs in this action are "[a]ll present and future pretrial detainees held by the Iowa Department of Corrections, awaiting hearing on their Iowa Code Chapter 229A petition, or who were committed pursuant to Iowa Code Chapter 229A." *See* Class Definition filed 6/4/2003. Iowa Code Chapter 229A provides for the civil commitment of sexually violent predators. The legislative findings leading to enactment of Chapter 229A in 1998 are articulated in Section 229A.1:

> The general assembly finds that a small but extremely dangerous group of sexually violent predators exists which is made up of persons who do not have a mental disease or defect that renders them appropriate for involuntary treatment pursuant to the treatment provisions for mentally ill persons under chapter 229, since that chapter is intended to provide short-term treatment to persons with serious mental disorders and then return them to the community. In contrast to persons appropriate for civil commitment under chapter 229, sexually violent predators generally have antisocial personality features that are unamenable to existing mental illness treatment modalities and that render them likely to engage in sexually violent behavior. The general assembly finds that sexually violent predators' likelihood of engaging in repeat acts of predatory sexual violence is high and that the existing involuntary commitment procedure under chapter 229 is inadequate to address the risk these sexually violent predators pose to society.

> The general assembly further finds that the prognosis for rehabilitating sexually violent predators in a prison setting is poor, because the treatment needs of this population are very long-term, and the treatment modalities for this population are very different from the traditional treatment modalities available in a prison setting or for persons appropriate

for commitment under chapter 229. Therefore, the general assembly finds that a civil commitment procedure for the long-term care and treatment of the sexually violent predator is necessary. The procedures regarding sexually violent predators should reflect legitimate public safety concerns, while providing treatment services designed to benefit sexually violent predators who are civilly committed. The procedures should also reflect the need to protect the public, to respect the needs of the victims of sexually violent offenses, and to encourage full, meaningful participation of sexually violent predators in treatment programs.

Iowa Code § 229A.1 (2004).

Defendants in this action are various persons or entities responsible for the implementation of Chapter 229A. The Iowa Department of Corrections ("IDOC"), under the authority of its director, W.L. Kautzky,[1] has assumed de facto responsibility and custody of the class members in this action, hereinafter referred to as the "Safekeepers," or simply as "Plaintiffs." Chapter 229A provides that the agency with jurisdiction over potential candidates for commitment as Sexually Violent Predators ("SVPs"), generally the IDOC, must provide written notice to the attorney general and a multidisciplinary team[2] no later than ninety days prior to:

 a. The anticipated discharge of a person who has been convicted of a sexually

violent offense from total confinement, except that in the case of a person who is returned to prison for no more than ninety days as a result of revocation of parole, written notice shall be given as soon as practicable following the person's readmission to prison.

 b. The discharge of a person who has been charged with a sexually violent offense and who has been determined to be incompetent to stand trial pursuant to chapter 812.

 c. The discharge of a person who has been found not guilty by reason of insanity of a sexually violent offense.

Iowa Code § 229A.3(1). Within thirty days of receiving notice that an individual is a candidate for SVP commitment, the multidisciplinary team "shall assess whether or not the person meets the definition of a sexually violent predator."[3] Iowa Code § 229A.3(4)(1). A review committee appointed by the attorney general then must review the records of each SVP candidate, including the assessment of the multidisciplinary team, to determine whether the individual qualifies as a sexually violent predator. Iowa Code § 229A.3(5).

If the prosecutor's review committee finds that a confined person qualifies as an SVP, the attorney general may then file a petition alleging that the person is an SVP and stating the facts supporting the allega-

---

**1.** Subsequent to the filing of this action, Gary D. Maynard assumed the position of director of the IDOC.

**2.** The multidisciplinary team is established by the director of the IDOC and "may include individuals from other state agencies to review available records of each person" referred to the team. Iowa Code § 229A.3(4). The multidisciplinary team is "immune from liability for any good-faith conduct" under Chapter 229A. *See id.* at 229A.3(3).

**3.** A sexually violent predator is defined as "a person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality which makes the person likely to engage in predatory acts constituting sexually violent offenses, if not confined in a secure facility." Iowa Code § 229A.2(9).

tion. *Id.* at 229A.4(1).[4] Once a petition is filed, a court must determine whether the individual should be transferred to "an appropriate secure facility." Within seventy-two hours of being taken into custody or transferred to such "appropriate secure facility," a court hearing must be held wherein a determination is made as to whether probable cause exists to believe that the person named in the petition is an SVP. *Id.* at 229A.5(1). The hearing may be waived by the accused SVP or may be continued by either party upon a showing of good cause. *Id.* at 229A.5(2). If, after the hearing, the court determines that probable cause exists, the court "shall direct that the respondent be transferred to an appropriate secure facility for an evaluation as to whether the respondent is a sexually violent predator." *Id.* at 229A.5(5). Within ninety days of a waiver of the probable cause hearing, or of the conclusion of the probable cause hearing, a trial will be held to determine, beyond a reasonable doubt, whether the respondent is an SVP. *Id.* at 229A.7(2). "The trial may be continued upon the request of either party and a showing of good cause...." *Id.* If a determination is made, beyond a reasonable doubt, that the respondent is an SVP, the person "shall be committed to the custody of the director of the department of human services for control, care, and treatment until such time as the person's mental abnormality has so changed that the person is safe to be at large." *Id.* at 229A.7(3). Chapter 229A provides that the determination that an individual is an SVP may be appealed and that each person committed under Chapter 229A shall have an annual review of their mental abnormality. *See id.* at 229A.7(3); 229A.8(1).

4. Such a petition may also be filed by the prosecuting attorney of the county where the person was convicted or charged, or by the attorney general at the request of such prosecuting attorney. Iowa Code § 229A.4(2).

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment has a special place in civil litigation. The device "has proven its usefulness as a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways." *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir.1991). In operation, the role of summary judgment is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required. *See id.; see also Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir.1990). "[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chemical Interchange Co.,* 541 F.2d 207, 209 (8th Cir.1976) (citing *Windsor v. Bethesda Gen. Hosp.,* 523 F.2d 891, 893 n. 5 (8th Cir.1975)). The purpose of the rule is not "to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broad. Sys., Inc.,* 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). Rather, its purpose is to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div., Houdaille Indus., Inc.,* 545 F.2d 1127, 1129 (8th Cir.1976) (citing *Lyons v. Board of Educ.,* 523 F.2d 340, 347 (8th Cir.1975)).

■ The plain language of Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The precise standard for granting summary judgment is well-established and oft-repeated: summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir.1994). The court does not weigh the evidence nor make credibility determinations, rather the court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Continental Grain Co. v. Frank Seitzinger Storage, Inc.,* 837 F.2d 836, 838 (8th Cir. 1988) (summary judgment "is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact") (citing *Wilson v. Myers,* 823 F.2d 253, 256 (8th Cir.1987)).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is genuine issue for trial. *See* Fed. R.Civ.P. 5(c), (e); *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis added). An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material .... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

## III. LAW AND ANALYSIS

### A. *Denial of Speedy Justice*

■ Plaintiffs argue that the failure to initiate SVP proceedings until immediately prior to the discharge of their criminal sentences violates their rights to a speedy trial. The documentation proffered by the parties indicate that the process of administratively identifying candidates for SVP confinement does, in fact, begin approximately ninety days prior to the candidate's release from incarceration. It is equally clear, however, that in practice, actions for commitment under Chapter 229A are not typically filed until a candidate's discharge from prison becomes imminent. It is this alleged "overall policy of deliberate delay which is being imposed across-the-board" that Plaintiffs assert constitutes a speedy trial violation. Pls.'s Br. at 4 n. 3.

■ It is clear that the full panoply of rights afforded criminal defendants under the Constitution are not applicable to the

Sexually Violent Predator Act because the Act is civil in nature. *See e.g., Allen v. Illinois,* 478 U.S. 364, 371–72, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986) (Fifth Amendment guarantee against compulsory self-incrimination inapplicable to commitment proceedings under Illinois' Sexually Dangerous Persons Act because commitment proceedings were regulatory and not criminal in nature and also finding that, even though some safeguards applicable to criminal proceedings were provided for by statute, the proceedings were not converted into criminal proceedings as a result thereof); *United States v. Perry,* 788 F.2d 100, 118 (3d Cir.1986) ("The speedy trial clause deals with the timeliness of criminal prosecutions, not civil commitment proceedings."). Nonetheless, case law relating to civil speedy trial rights is sparse. Thus, the law surrounding speedy trial rights in the criminal context is instructive.

■■ In a criminal trial, the law makes clear that no right to a speedy trial inures until prosecution actually begins. "[Speedy Trial] rights would seem to afford no protection to those not yet accused, nor would they seem to require the Government to discover, investigate, and accuse any person within any particular period of time." *United States v. Marion,* 404 U.S. 307, 313, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971) (but noting that if an actual restraint on liberty is imposed, speedy trial provisions may be triggered: "[I]t is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment."). A natural corollary to this proposition, then, is that if a criminal defendant has no right to a speedy trial until such time as he is criminally accused, neither does a civil commitment candidate have a speedy trial right until such time as

he is identified by the statutory process as a candidate for commitment. Likewise, Plaintiffs offer no legal support for the proposition that the State, by waiting until ninety days prior to release to identify commitment candidates, and then waiting until release is imminent to actually file the SVP petition, is somehow depriving the SVP candidates of due process rights.

Plaintiffs argue that "[s]peedy trial norms are not measured simply from the time of formal arraignment, but also from the time that a person is first held in restraint." Pls.' Br. at 6. Thus, they contend that the delay between the time that the candidate "is or could easily be singled out by the executive branch for sexual offender commitment and the date upon which the formal petition is filed" is unacceptable. *Id.* The problem with this argument, however, is that the candidates for SVP commitment are, during the "unacceptable" time frame noted by Plaintiffs, in custody anyway for purposes of serving out a criminal sentence of incarceration. This restraint is wholly unrelated to the SVP proceedings and the State is under no legal or constitutional duty to minimize time in custody by ensuring that SVP commitment proceedings overlap substantially with criminal incarceration. This conclusion is reinforced by the assertion of the State, that the nature of sex offender treatment imposed as a condition of criminal incarceration is most effective toward the end of the incarceration term. As a matter of fundamental fairness, the State cannot file an SVP commitment petition until it is clear whether an identified candidate will successfully complete sex offender treatment. This determination of successful or unsuccessful custodial treatment necessarily impacts the State's decision whether SVP commitment would be necessary. *See e.g., People ex rel. Smith v. Jackson,* 37 Ill.2d 379, 227 N.E.2d 366 (1967) (finding that when prisoner about to

be released from twenty year rape sentence was made subject of Sexually Dangerous Person commitment, there was no due process violation since the delay in bringing the proceedings under the act was reasonable in that it was of the greatest importance that the examination of the prisoner was made shortly before the expected release date since his condition on that date was the relevant consideration and it would be of no benefit to cause an examination to be made and a hearing to be held several months prior to the convict's release).

Thus, for purposes of evaluating the timeliness of the commitment proceedings under the SVP Act, the Court looks to the overall period of time from the commencement of proceedings to the trial of the SVP candidates to determine whether there is a violation of the right to be free from bodily restraint without speedy court process. Clearly, upon filing of the petition, a prompt preliminary determination of probable cause must be made by a judge pursuant to section 229A.5(1). If such determination is affirmatively made, then within seventy-two hours of being taken into custody, the SVP candidate is entitled to a full adversary hearing on the issue of probable cause pursuant to section 229A.5(2). Then, within ninety days, the candidate is entitled to a full adversary hearing, with virtually all protections afforded a criminal defendant, to determine whether the person is a sexually violent predator by the standard of beyond a reasonable doubt.

The purpose of affording individuals deprived of personal freedom a speedy trial are threefold: 1) to prevent undue and oppressive incarceration prior to trial; 2) to minimize anxiety and concern accompanying public accusation; and 3) to limit the possibility that long delay will impair the ability of the accused to defend himself. *See United States v. Ewell*, 383 U.S. 116, 120, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966). Speedy trials offer "an important safeguard to prevent undue and oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend himself." *Id.* Nonetheless, "[a] requirement of unreasonable speed would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself." *Id.* Accordingly, "The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice .... The delay must not [however] be purposeful or oppressive." *Id.*

The Supreme Court has held that there is no specific threshold for violation of speedy trial rights. Rather the Court has recognized that "a defendant's constitutional right to a speedy trial can only be determined on an ad hoc balancing basis." *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *see also Thomas v. United States*, 501 F.2d 1169, 1171 (8th Cir.1974); *United States v. Cummings*, 507 F.2d 324, 330 (8th Cir.1974). Factors to be considered in determining whether a particular defendant has been deprived of his right to "speedy" process are: length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. *Barker v. Wingo*, 407 U.S. at 530, 92 S.Ct. 2182. "To trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay, since, by definition, he cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary promptness." *United States v.*

*Sprouts,* 282 F.3d 1037, 1042 (8th Cir.2002) (citing *Doggett v. United States,* 505 U.S. 647, 651–52, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992))

In the present case, Plaintiffs contend that, in cases where the candidate contests his commitment, the average time needed to fairly try a case is seven months[5] from the time defense counsel is appointed.[6] The Court cannot say that this is presumptively prejudicial. *See United States v. Perez–Perez,* 337 F.3d 990 (8th Cir.2003) (five-month delay between illegal reentry defendant's arrest and first trial date was not presumptively prejudicial delay, of kind requiring Sixth Amendment speedy trial inquiry); *United States v. Patterson,* 140 F.3d 767, 772 (8th Cir.1998) (five month period between initial detention and drug charges "not sufficiently long to be presumptively prejudicial"); *United States v. McFarland,* 116 F.3d 316, 318 (8th Cir. 1997) (lapse of approximately seven months between indictment and trial "too brief a delay to trigger review of … Sixth Amendment speedy trial claim"); *accord Doggett,* 505 U.S. at 652 n. 1, 112 S.Ct. 2686 (indicating that lower courts have generally found delay approaching one year to be presumptively prejudicial); *Barker,* 407 U.S. at 533, 92 S.Ct. 2182 (delay of well over five years was presumptively prejudicial).

Even were a seven month period of delay presumptively prejudicial, the *Barker* balancing factors weigh in favor of a finding of no speedy trial violation. First, the length of the delay is, at least in part, intended to permit a full mental evaluation of the SVP commitment candidates. While the precise time required to achieve this purpose is unclear, it certainly justifies at least a portion of the delay between the probable cause finding and the trial. Next, and most importantly, the statute provides for trial within ninety days of the probable cause hearing. While either party can move for a continuance, Plaintiffs do not dispute that it is virtually always counsel for the SVP commitment candidates that request such continuances. Plaintiffs allege, however, that the need to request continuances should not be held against them because it is necessary for their counsel to adequately prepare for the commitment trial. Nonetheless, the need for continuances to perform ample trial preparation is not unusual in either the criminal or civil trial context. Plaintiffs have offered no evidence, however, other than the bald assertion that the State's intent is "sinister" to support the notion that it has designed the statute and time limitations for the purpose of keeping Plaintiffs locked up for as long as possible. Indeed, both parties have an interest in seeing the adversarial process conclude as efficiently and expediently as possible. Finally,[7] Plaintiffs have failed to show that the delay between petition and trial substantially prejudices their rights. Plaintiffs proffer that the coercive effect of the dead-time they face interferes with their ability to engage in legal resistance. The Court believes, however, this pertains more to the conditions of confinement than to the legality of the time of time kept in custody

---

**5.** Defendants do not admit that seven months is the average time frame, however, for purposes of this motion, the Court will assume accuracy.

**6.** It appears that counsel is appointed to represent each candidate for SVP commitment no later than the probable cause hearing. Iowa Code Section 229A.5(2)(d).

**7.** The Court does not analyze whether Plaintiffs have "asserted their rights" because there is no requirement that they do so in a purely civil context, as opposed to a criminal action.

pending trial in accordance with speedy trial rights.

## B. *Detention in Contravention of Statute*

██ Plaintiffs next assert that Iowa Code Chapter 229A establishes the purpose of pretrial detention as being "for an evaluation ... as to whether the respondent is a sexually violent predator." *See* Iowa Code 229A.5(5). "In practice, the Safekeepers are being detained for periods that tremendously exceed that needed for 'an evaluation,' in conditions that frustrate evaluation and during which, no evaluation is actually occurring." Pls.' Br. at 15. Plaintiffs assert that where, as here, the statute provides the sole authority to detain the Safekeepers, then ˙ detention longer or for purposes other than those expressly provided by statute is impermissible. Plaintiffs, however, fail to point out the provision of Chapter 229A.5B, which provides, "A respondent who is in custody under this chapter *shall remain in custody unless released by court order or discharged under section 229A.10.*" Iowa Code 229A.5B (2001) (emphasis added).

Furthermore, Chapter 229A provides that within seventy-two hours after being taken into custody, "a hearing shall be held to determine whether probable cause exists to believe the detained person is a sexually violent predator." Iowa Code 229A.5(2). A "sexually violent predator" is defined as "a person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality which makes the person *likely to engage* in predatory acts constituting sexually violent offenses, *if not confined in a secure facility.*" Iowa Code 229A.2(11) (emphasis added). Thus, by implication, when a judge determines that probable cause exists to believe the person is a sexual predator, the judge is also finding that the individual is likely to engage in

predatory acts if such person is not confined in a secure facility. Accordingly, the statute provides, though perhaps in not the most artful way, for both an evaluation component—to determine whether the those confined pursuant to the statute are "sexually violent predators,"—and a "safekeeping" component—to separate these persons˙ from the˙ community at large because of the apparent mental abnormality presenting a danger to themselves or others. Plaintiffs, therefore, are not being held in contravention of statute, but rather are held for the purposes allowed and contemplated thereby.

## C. *Denial of Bail*

██ While the Eighth Amendment does not grant an absolute right to bail, there is a substantive liberty interest in freedom from confinement. It is clear that because of that interest, there are substantive limitations upon the power ˙of government, state or federal, to impose civil detention. *See O'Connor v. Donaldson,* 422 U.S. 563, 575, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975) (mental illness does not alone justify confinement); *Jackson v. Indiana,* 406 U.S. ˙715, 738, 92 S.Ct.˙1845, 32 L.Ed.2d 435 (1972) (pendency of a charge that cannot be tried because of mental illness does not, by itself, justify confinement). There˙ is very little law, ˙ however, on the issue of whether civil detainees awaiting trial are entitled to bail in any instance.

██ From a federal perspective, the Iowa statutory scheme appears constitutional because detention is premised upon a judge's prompt probable cause finding that the individual is a sexually violent predator, meaning that he suffers from a mental abnormality making it likely that the individual will engage in predatory acts constituting sexually violent offenses, "if not confined in a secure facility." The denial of bail in circumstances evidencing

mental abnormalities and dangerousness have been routinely upheld. *See Kansas v. Hendricks,* 521 U.S. 346, 352, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (permitting civil detention of people with "mental abnormality" that rendered them likely to commit "predatory acts of sexual violence"); *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (requiring the state to prove by clear and convincing evidence that a person is mentally ill and requires hospitalization to protect himself and others before commitment to a mental institution satisfies due process); *see also Foucha v. Louisiana,* 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) (indicating that both a finding of mental illness and dangerousness would be required to maintain civil commitment and requiring such burden be carried by the government); *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (requiring mental illness and dangerousness as conditions for nonrelease).

■ While it is unclear whether detainees pending civil commitment ever have an absolute right to bail, it is well-established that due process requires the "nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jackson v. Indiana,* 406 U.S. at 738, 92 S.Ct. 1845. Due process is satisfied in this case because the determination of mental abnormality and dangerousness is made at the outset of the confinement. This determination, in turn, is reasonably related to denying bail to the Plaintiffs pending a full-blown hearing. The statute here at issue permits the potential detainee an opportunity to put forth evidence, at the probable cause hearing, in an effort to show that he is not dangerous or does not suffer from a mental abnormality. Without such determinations, no commitment pending trial would be ordered because of

the strict requirements upon the probable cause determination. *See Hendricks,* 521 U.S. at 357, 117 S.Ct. 2072 (civil commitment approved where detainee was given opportunity to challenge the commitment and the "confinement takes place pursuant to proper procedures and evidentiary standards"). Essentially the case law requires that there must be an individual determination, whether called a bail hearing or not, before someone is locked away. Such opportunity is provided under the Iowa statute, and at least from a federal perspective, appears to comport with due process.

Plaintiffs' more vehement argument, however, is that the Iowa constitution guarantees an absolute right to bail. Plaintiffs rely on common law in support of this argument and claim that, at the time Iowa became a state and adopted its own constitution, it was well settled that there was an unequivocal right to bail in civil cases. *See* Pls.' Br. at 22–24. Moreover, Plaintiffs cite the Iowa Constitution, Article I, sections 10 and 12 in support of the notion that bail is guaranteed. As pointed out by Defendants, however, these provisions relate specifically to criminal actions. Except to the extent that section 10 refers to matters "involving the . . . liberty of an individual," the section does not specifically address either civil commitment actions or the right to bail. Similarly, section 12 states: "All persons shall, before conviction, be bailable, by sufficient sureties, except for capital offences where the proof is evident, or the presumption great." Again, the reference to "before conviction" supports the conclusion that only criminal defendants have an absolute right to bail, and even then, not in the event of "capital offences where proof is evident."

■ Plaintiffs request that the matter of whether bail is an entitlement under Iowa law be certified to the Iowa Supreme

Court. This Court possesses authority to certify matters of State law when doing so would effectively save time, energy, and resources, and help to build "a cooperative judicial federalism." *Lehman Bros. v. Schein*, 416 U.S. 386, 390–91, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974). In this case, the Court believes that certification will assist in a speedy resolution of the issue, particularly in light of the lack of clear Iowa law on the matter. Accordingly, the Court certifies the following question to the Iowa Supreme Court: "Are pretrial detainees being held pursuant to Iowa Code Chapter 229A entitled to bail under either the common law or the Iowa Constitution?"

### D. *American With Disabilities Act*

Plaintiffs allege that they are disabled persons within the meaning and protection of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131 et seq. Specifically, Plaintiffs claim that they are persons with perceived disabilities under Title II and that because of their disabilities, they have been discriminated against by the Defendants in terms of facilities, programs and services. Plaintiffs submit evidence of the conditions of confinement showing them to be more restrictive than necessary and also more restrictive than those provided to other non-disabled persons in equivalent circumstances.

Plaintiffs state, and Defendants concede, that while subject to pretrial commitment detention, they are being denied access to and participation in facilities, programs, services, and treatment. The Defendants assert that they are immune under the Eleventh Amendment from Plaintiffs' ADA violation claims. The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." [8] U.S. Const. amend XI. "The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Board of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001).

The Supreme Court has held that courts must employ a two-part test to determine whether a congressional statute actually operates to abrogate a state's Eleventh Amendment immunity. First, the statute must contain an "unequivocal expression" of Congress's intent to abrogate the states' immunity. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). Second, the statute must be an appropriate exercise of Congress's constitutional powers for its abrogation provision to have effect. *Id.* After the Supreme Court found that section 504 of the Rehabilitation Act did not abrogate Eleventh Amendment state immunity because it did not unequivocally express its intent to do so, Congress attempted to rectify the situation by enacting 42 U.S.C. Section 2000d–7, which provides: "A State

---

**8.** Section 1 of the Fourteenth Amendment provides: "No State shall make or enforce any law which abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1. Section 5 of the Fourteenth Amendment grants Congress the power to enforce the Section 1 guarantees via "appropriate legislation." U.S. Const. amend XIV, § 5. Congress may only "subject nonconsenting States to suit in federal court when it does so pursuant to" § 5 of the Fourteenth Amendment. *See Garrett*, 531 U.S. at 364, 121 S.Ct. 955.

shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 [29 U.S.C.A. § 794] . . . or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance." While clearly, section 2000d–7 satisfies the first portion of the *Seminole* test, numerous courts have found that Eleventh Amendment immunity is still not abrogated with respect to portions of the ADA because the abrogation is not an appropriate exercise of Congress's constitutional power.

 The determination of whether a Congressional act is within its constitutional authority is for the Courts to decide. *See City of Boerne v. Flores*, 521 U.S. 507, 520, 530, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). Legislation is an appropriate exercise of Congress's section 5 power only when it is preventative or remedial. *See id.* (legislation reaching beyond the scope of section l's actual guarantees must exhibit "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end."); *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (noting Congress may remedy or deter violations of the Fourteenth Amendment guarantees, but may go no further, because to do so would substantively redefine the guarantees of the Fourteenth Amendment, and Congress "has been given [only] the power 'to enforce,' not the power to determine *what constitutes* a constitutional violation.") (emphasis in original).

In *Board of Trustees of the University of Alabama v. Garrett*, the Supreme Court held that Title I[9] of the ADA was not a valid abrogation of the states' Eleventh Amendment immunity. *Garrett*, 531 U.S. at 373–74, 121 S.Ct. 955. The Court noted that the legislative record of the ADA did not identify a pattern of unconstitutional discrimination by the states and that even if such a record existed "the rights and remedies created by the ADA against the States would raise the same sort of concerns as to congruence and proportionality as were found in *City of Boerne*." *Id.* at 357–58, 121 S.Ct. 955. The *Garrett* Court, however, explicitly limited its ruling to Title I of the ADA, stating it was "not disposed to decide the constitutional issue whether Title II, which has somewhat different remedial provisions from Title I, is appropriate legislation under § 5 of the Fourteenth Amendment." *Id.* at 360 n. 1, 121 S.Ct. 955. The Court's analysis, did, however, offer guidance to other courts that would eventually consider the Title II issue.

Several courts, including the Eighth Circuit Court of Appeals, have determined that the sovereign immunity waiver of section 2000d–7 does not apply to claims brought under Title II of the ADA. "Under the reasoning set forth in *Boerne*, we do not think that extension of Title II of the ADA to the states constitutes a proper exercise of Congress's power under Section 5." *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1007 (8th Cir.1999) (en banc), *reaffirmed by Klingler v. Director, Dept. Of Revenue*, 281 F.3d 776 (8th Cir. 2002) (holding that *Alsbrook* bars claims against states for violation of Title II); *see also Wessel v. Glendening*, 306 F.3d 203 (4th Cir.2002) (holding Congress did not validly abrogate Eleventh Amendment immunity of states when it enacted Title

**9.** Title I prohibits employers from discriminating against "qualified individual[s] with a disability."

II of the Americans with Disabilities Act); *Thompson v. Colorado*, 278 F.3d 1020, 1034 (10th Cir.2001) ("Without this foundation [of a history of extensive litigation and discussion of constitutional violations], Title II cannot be considered preventive or remedial legislation that is congruent and proportional to any constitutional violation.... Thus, Title II is not a valid abrogation of the states' Eleventh Amendment immunity."); *accord Popovich v. Cuyahoga County Court of Common Pleas*, 276 F.3d 808 (6th Cir.2002) (finding private monetary remedies against the state under Title II were invalid under *Garrett*); *Reickenbacker v. Foster*, 274 F.3d 974 (5th Cir.2001) (effectively overruling prior decision in *Coolbaugh v. Louisiana*, 136 F.3d 430 (5th Cir.1998), which had held Title II to be a valid exercise of congressional authority); *cf. Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*, 280 F.3d 98 (2d Cir.2001) (narrowing private right of action to circumstances where it is shown that the state had acted irrationally, and, therefore, unconstitutionally); *Kiman v. New Hampshire Dept. Of Corrections*, 301 F.3d 13 (1st Cir.2002) ("Congress acted within its powers in subjecting the states to private suit under Title II of the ADA, at least as that Title is applied to cases in which a court identifies a constitutional violation by the state."). Plaintiffs cite *Clark v. State of California* in support of its position that Title II [10] ADA claims can proceed in light of the section 2000d–7 waiver of sovereign immunity. *See Clark v. State of Cal.*, 123 F.3d 1267, 1270 (9th Cir.1997). *Clark* held that Congress acted under a

valid exercise of its power when it abrogated states' Eleventh Amendment immunity in disability discrimination suits under the ADA and Rehabilitation Acts. *Id.* As evidenced in part above, however, the Ninth Circuit is the only Circuit Court of Appeal to hold that Title II remains valid in its entirety after *Garrett.*

■■■■ In light of current case law of *this* circuit, the Court finds that any suit by Plaintiffs against any of the Defendants in their professional capacity [11] for monetary damages pursuant to Title II of the ADA are barred by the doctrine of sovereign immunity. Likewise, to the extent that Plaintiffs' complaint alleges a section 1983 violation against any Defendant in his individual or personal capacity, suit is barred by *Alsbrook* and its predecessors. *See Alsbrook*, 184 F.3d at 1011(holding Title II's detailed remedial scheme bars the maintenance of section 1983 actions against state actors in their individual capacities for alleged violations of the ADA).

■■■■ To the extent that Plaintiffs' Complaint alleges suit under section 504 of the Rehabilitation Act of 1973, the Court finds a waiver of sovereign immunity is only apparent as to the Iowa Department of Corrections. *See* Exh. H–1 (indicating the Department of Corrections receives substantial federal funding). In analyses separate and distinct from those under the ADA, the Eighth Circuit Court of Appeals has recognized that the Rehabilitation Act requires states that accept federal funds to waive their Eleventh Amendment immunity in federal suits for violations of section

---

**10.** Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

**11.** Neither party argues that the named Defendants are not state actors for purposes of Eleventh Amendment immunity.

504. *See e.g., Jim C. v. United States,* 235 F.3d 1079 (8th Cir.2000). Nonetheless,

> [b]y accepting funds offered to an agency, the State waives its immunity only with regard to the individual agency that receives them. A State and its instrumentalities can avoid Section 504's waiver requirement on a piecemeal basis, by simply accepting federal funds for some departments and declining them for others. The State is accordingly not required to renounce all federal funding to shield chosen state agencies from compliance with Section 504.

*Id.* at 1081. The only evidence in the record of any Defendant receiving federal funds relates to the Iowa Department of Corrections.

While acknowledging that any claim by Plaintiffs for monetary damages pursuant to the ADA is barred by the Eleventh Amendment, the Court does note that Plaintiffs may still pursue prospective injunctive relief against state officials or entities. In *Ex parte Young,* the Supreme Court held that Eleventh Amendment immunity was not available to state officials in suits seeking prospective injunctive relief for violations of federal law. *Ex parte Young,* 209 U.S. 123, 155–56, 28 S.Ct. 441, 52 L.Ed. 714 (1908). In *Randolph v. Rodgers,* the Eighth Circuit held this principle applicable to claims based on Title II of the ADA. *Randolph v. Rodgers,* 253 F.3d 342, 347–48 (8th Cir.2001). Even assuming, however, that Plaintiffs wish to maintain the ADA claim where the only remedy permissible is a declaratory or injunctive order, the record is wholly devoid of any evidence that would permit the Court to make any further determinations on the issue of the scope of such injunction.

### E. Conditions of Confinement

Plaintiffs next argue that they are subject to administrative segregation. At the time the present litigation began, the Safekeepers were housed in constant solitary confinement at the Medical Classification Center in Oakdale, Iowa. At some point during the litigation, the Safekeepers were returned to the Newton Correctional Facility in Newton, Iowa. Nonetheless, the Safekeepers contend that they have benefitted from "only slightly more freedom and a better physical facility." Pls.' Br. at 33–34. The conditions are still constitutionally unacceptable, according to Plaintiffs, both because the temporary change to Newton was litigation driven, and because the conditions at Newton are not materially better than they were at Oakdale. Specifically, Plaintiffs argue that the conditions faced "have been and continue to be worse than those experienced by the general prison populations in the penal institutions in which they have been held." *Id.* at 37.

The record is clear that, while confined at Oakdale, Plaintiffs were held in conditions of confinement designed for convicted criminals being punished for disciplinary infractions, *i.e.,* administrative segregation. In the general prison population at Oakdale, persons serving sentences of incarceration are generally permitted to work, visit the commissary, visit the library; have radio and TV privileges, have writing privileges, make unlimited phone calls subject to the phone working and other inmate calls, and have access to religious services and religious personnel. Conditions in the administrative segregation unit at Oakdale were admittedly more restrictive, including: limited access to media, TV, or radio; lights kept on twenty-four hours per day; access to only one book and two magazines at a time; only let out of cells one hour per day, five days per week for exercise; receive food and medication through small opening in eight foot

by eight foot cells; limited access to hygiene items; no treatment for mental abnormalities, including either counseling or medication; small exercise yard without actual exercise equipment; limited to one phone call per week; no access to commissary; and denial of access to religious services, though the detainees may have contact with religious persons.

At some point in time, the Safekeepers were transferred to Newton Correctional Facility. Clearly, the conditions at Newton offer an improvement over those at Oakdale, but the Plaintiffs argue they are still constitutionally inadequate. The appendices filed in regards to Plaintiffs' motion for summary judgment reflect the following about the conditions at Newton: detainees are housed in two-person cells measuring approximately 7 feet by 14 feet; they are permitted out of the cells for approximately 3½ hours per day for exercise in a 30 foot by 100 foot concrete exercise pen; they are permitted to go to the gym for 45 minutes approximately once per week; detainees are allowed access to the library one day per week for 45 minutes and access to the law library one day per week for 45 minutes; detainees still have no access to radios, but are permitted black and white televisions in their cells. In addition, detainees awaiting commitment trials are required to wear green name tags identifying them as "sex offenders" and the door of each cell is marked with a yellow tag, denoting "sexually violent predator." Detainees at Newton still do not have access to educational programming or mental health rehabilitation or religious services. They are permitted a one-hour, no contact visit once per week with immediate family only. Smoking is not permitted, nor is working at jobs within the facility. Each affidavit of SVP candidates states that the conditions they faced in general prison populations were substantially better than those accorded the Safekeepers at Newton.

When the purpose of a statutory scheme is to incapacitate and to treat, as is the case with Iowa's sexually violent predator commitment act, "due process requires that the conditions and duration of confinement under the Act bear some reasonable relation to the purpose for which persons are committed." *Seling v. Young,* 531 U.S. 250, 265, 121 S.Ct. 727, 148 L.Ed.2d 734 (2001). Moreover, individuals subject to civil commitment have been said to enjoy a constitutionally protected interest in "reasonably nonrestrictive confinement conditions" and "more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo,* 457 U.S. 307, 321–22, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). Thus, in cases such as this one, when the conditions of civil commitment are actually harsher than the conditions the same individuals were subjected to as criminal inmates, it is clear that due process cannot be satisfied unless the conditions are reasonably related to the purpose of the commitment.

Defendants acknowledge that the "only legitimate justification for the curtailment of liberty involved here pending a commitment hearing is the danger posed by the possibly mentally ill to themselves or others." Def.s' Br. at 5 (citing *Lynch v. Baxley,* 744 F.2d 1452, 1458 (11th Cir. 1984)). The detention of the Safekeepers, being civil in nature, must bear some reasonable relationship to the purpose of their pretrial detention—safekeeping and evaluation. The mere fact that Plaintiffs are subject to institutional restrictions, however, is not alone determinative of whether the restrictions comport with due process:

> Not every disability imposed during pretrial detention amounts to "punishment" in the constitutional sense, however.

Once the Government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention. Traditionally, this has meant confinement in a facility which, no matter how modern or how antiquated, results in restricting the movement of a detainee in a manner in which he would not be restricted if he simply were free to walk the streets pending trial. Whether it be called a jail, a prison, or a custodial center, the purpose of the facility is to detain. Loss of freedom of choice and privacy are inherent incidents of confinement in such a facility. And the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into "punishment."

*Bell v. Wolfish,* 441 U.S. 520, 537, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). "Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.' Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees." *Id.* (citations omitted).

■■■ Once the Plaintiffs have come forward with evidence supporting their motion for summary judgment, the defendants cannot simply rest on their laurels and proclaim summary judgment inappropriate. Rather, Defendants must come forward with some actual evidence, supported by the record in the case, showing a genuine issue for trial. Summary judgment is not a paper trial. Accordingly, "the district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994). In a motion for summary judgment, this Court has but one task: to decide, based on the evidence of record as identified in the parties' moving and resistance papers, whether there is any material dispute of fact that requires a trial. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505; 10 Charles A. Wright, Arthur R. Miller & Mary Kay Kane § 2712, at 574–78. The parties then share the burden of identifying the evidence that will facilitate this assessment. *Waldridge,* 24 F.3d at 921.

■■■ To further this end, Federal Rule of Civil Procedure 56(e)(1) mandates: "The adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." In this District, Local Rule 56.1(b) supplements the terms of the federal rule. The local rule provides the specific procedure by which a resisting party must set forth the specific facts showing that there is a genuine issue for trial. Failure to abide by the local rule results in a party's inability to conform to the terms of the federal rule, and, per the federal rule, may result in an entry of summary judgment against the adverse party.

Plaintiffs have presented properly supported documentation showing the conditions in which they are presently held, and detailing how those conditions differ from conditions imposed on persons subject to punishment via incarceration. Defendants

have not filed an appendix, a resistance to Plaintiffs' statement of undisputed fact, or even a comprehensive brief addressing individually each of the claims raised by Plaintiffs. Likewise, Defendants have come forth with no evidence, other than a statement of concern about the mental instability and dangerousness of SVP candidates to justify the restrictive atmosphere in which the Safekeepers were held at Oakdale, and are now held at Newton. No reason is offered as to why the Safekeepers are subject to far more restrictive conditions than they were while serving an actual criminal sentence for sexually violent acts.[12] The Court finds it noteworthy as well, that Defendants do not dispute the fact that Plaintiffs are not eligible, in their current pretrial confinement, for any sort of mental health treatment or counseling. This seems particularly ironic given the assertion by the Defendants, *supra*, that sex offender treatment is most effective just prior to release from custody. It appears that a long lapse in treatment would have negative effects not only for the Safekeepers, but also for the community if the ultimate determination at trial is that the individual is not an SVP subject to commitment. Similarly, if a Safekeeper is determined to be a sexually violent predator subject to commitment, it seems logical that treatment during the pretrial phase would serve the interests of the intensive treatment to be conducted post-commitment.

Having carefully reviewed the record, the Defendants' stated reason for the conditions and restrictions of Plaintiffs' confinement—to keep them from harming themselves or others—appear reasonably related only to the fact of detention. Nat-

urally, certain restrictions will be necessary regardless of where these persons are housed, as a necessary corollary to the detention itself. The Court, however, can find no discernible legitimate governmental objective that is reasonably related to the specific conditions of confinement, *i.e.*, keeping the Safekeepers in lockdown the majority of the day, and denying them reasonable access to visitors, telephone privileges, educational programming, mental health treatment, recreation, exercise, religious services, medical care, and hygiene. Accordingly, the Court infers,[13] as it legally may, that the purpose of the restraints upon the Safekeepers are for punishment and thus, do not comply with the requirements of due process. *See Bell v. Wolfish*, 441 U.S. at 537, 99 S.Ct. 1861 ("if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment ...."). "Summary judgments in favor of parties who have the burden of proof are rare, and rightly so." *Turner v. Ferguson*, 149 F.3d 821, 824 (8th Cir.1998). However, in a case such as this, where the Defendants have made no attempt to identify reasonable purposes for the restrictive conditions imposed on the Plaintiffs, summary judgment on the issue of conditions of confinement is appropriate and is, therefore, granted. Despite this conclusion, however, the question of what restrictions may reasonably and constitutionally be imposed remains open.

### F. *Imposition of Double Jeopardy*

Plaintiffs finally contend that the delay in initiating SVP proceedings until immedi-

---

**12.** Interestingly, Chief Magistrate Judge Walters made a similar finding, *i.e.*, that the Government had failed to proffer a legitimate purpose for the conditions of incarceration, in a prior related ruling. *See* App. Exh. D.

**13.** The Oxford English Dictionary defines "infer" as "to deduce from evidence and reasoning rather than from explicit statements."

ately prior to the discharge of their criminal sentences is for no reason other than to punish them by subjecting them to as lengthy a term of custody as possible, thus constituting a violation of their right to be free from the imposition of double jeopardy. The Fifth Amendment to the United States Constitution, adopted in 1791, provides that no person shall be "subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. "[T]hough former jeopardy is a criminal law concept, it is by now settled that, if other conditions are met, either criminal prosecutions or civil proceedings instituted by the same sovereign may result in punishment sufficient to implicate the Double Jeopardy Clause." *United States v. Stoller*, 78 F.3d 710, 715 (1st Cir.1996) (citing *United States v. Halper*, 490 U.S. 435, 443, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989)).

There is no doubt, under *Kansas v. Hendricks*, the general nature of confinement under the statute as written is civil in nature and thus, by its terms does not violate the Double Jeopardy clause. *See Kansas v. Hendricks*, 521 U.S. at 346, 117 S.Ct. 2072. In *Hendricks*, the Supreme Court evaluated the constitutionality of the Kansas Sexually Violent Predator Act, a civil commitment statute in many regards identical to the Iowa statute here at issue. Noting that "[t]he categorization of a particular proceeding as civil or criminal 'is first of all a question of statutory construction,'" the Court went on to ascertain whether the Kansas legislature intended the statute to establish "civil" proceedings. *Hendricks*, 521 U.S. at 361, 117 S.Ct. 2072 (citing *Allen v. Illinois*, 478 U.S. at 368, 106 S.Ct. 2988). The Court noted that the Kansas legislature clearly intended to make the Act civil in nature, as evidenced by its placement in the Probate Code and by its description of the purpose of the act as creating a "civil commitment procedure." *Id.* "[W]e will reject the legislature's manifest intent only where a party challenging the statute provides 'the clearest proof' that 'the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil,'" *Id.* (citing *United States v. Ward*, 448 U.S. 242, 248–249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)). The Court found that the Kansas scheme was not sufficiently punitive to implicate the Double Jeopardy clause:

As a threshold matter, commitment under the Act does not implicate either of the two primary objectives of criminal punishment: retribution or deterrence. The Act's purpose is not retributive because it does not affix culpability for prior criminal conduct. Instead, such conduct is used solely for evidentiary purposes, either to demonstrate that a "mental abnormality" exists or to support a finding of future dangerousness. We have previously concluded that an Illinois statute was nonpunitive even though it was triggered by the commission of a sexual assault, explaining that evidence of the prior criminal conduct was "received not to punish past misdeeds, but primarily to show the accused's mental condition and to predict future behavior." *Allen, supra,* at 371, 106 S.Ct., at 2993. In addition, the Kansas Act does not make a criminal conviction a prerequisite for commitment—persons absolved of criminal responsibility may nonetheless be subject to confinement under the Act. See Kan. Stat. Ann. § 59–29a03(a) (1994). An absence of the necessary criminal responsibility suggests that the State is not seeking retribution for a past misdeed. Thus, the fact that the Act may be "tied to criminal activity" is "insufficient to render the statut[e] punitive." *United States v. Ursery*, 518 U.S. 267, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996).

Moreover, unlike a criminal statute, no finding of scienter is required to commit an individual who is found to be a sexually violent predator; instead, the commitment determination is made based on a "mental abnormality" or "personality disorder" rather than on one's criminal intent. The existence of a scienter requirement is customarily an important element in distinguishing criminal from civil statutes. *See Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168, 83 S.Ct. 554, 567–568, 9 L.Ed.2d 644 (1963). The absence of such a requirement here is evidence that confinement under the statute is not intended to be retributive. Nor can it be said that the legislature intended the Act to function as a deterrent. Those persons committed under the Act are, by definition, suffering from a "mental abnormality" or a "personality disorder" that prevents them from exercising adequate control over their behavior. Such persons are therefore unlikely to be deterred by the threat of confinement.

Although the civil commitment scheme at issue here does involve an affirmative restraint, "the mere fact that a person is detained does not inexorably lead to the conclusion that the government has imposed punishment." *United States v. Salerno,* 481 U.S. 739, 746, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987). The State may take measures to restrict the freedom of the dangerously mentally ill. This is a legitimate nonpunitive governmental objective and has been historically so regarded. *Cf. id.,* at 747, 107 S.Ct., at 2101–2102. The Court has, in fact, cited the confinement of "mentally unstable individuals who present a danger to the public" as one classic example of nonpunitive detention. *Id.,* at 748–749, 107 S.Ct., at 2102–2103. If detention for the purpose of protecting the community from harm necessarily constituted pun-

ishment, then all involuntary civil commitments would have to be considered punishment. But we have never so held.

*Id.* at 361–62, 117 S.Ct. 2072.

■ Given that the Iowa statute is virtually identical to the Kansas statute, Plaintiffs here do not object to whether the statute itself is criminal or civil in nature. Plaintiffs, in fact, concede that the statute is civil. The difference here, Plaintiffs argue, is that the *implementation* of the statutory scheme has resulted in an "across-the-board policy of administrative delay for the very purpose of imposing an additional period of 'dead time' incarceration." Pls.' Br. at 11. Stated another way, Plaintiffs assert that the Defendants have deliberately created a process whereby postponements of the proceedings are inevitable and that subjects the Safekeepers to long periods in isolation, subject to conditions more restrictive and punitive than those imposed on the general prison population.

The Supreme Court has identified factors that assist in determining whether the conditions and restrictions accompanying pretrial detention amount to punishment in the constitutional sense of the word:

A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." Thus, if a particular condition or restriction of pretrial detention is reasonably related to a

legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees. Courts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility.

*Bell v. Wolfish,* 441 U.S. at 538, 99 S.Ct. 1861 (internal citations omitted).

In the present case, the harsh conditions alleged to be imposed upon the Safekeepers pending trial are adequately supported by the record. The Plaintiffs have not shown an "expressed intent to punish." *Id.* Nonetheless, the Court found, *supra,* that the conditions of confinement do constitute punishment because the Defendants have failed to proffer a legitimate, reasonably related purpose for their imposition, and because the Court cannot identify an alternative purpose for them. *See supra* Sec. E. Accordingly, the Court finds that Plaintiffs, by the nature of the pre-trial confinement, are entitled to summary judgment on their claim that the detention scheme constitutes Double Jeopardy.

## IV. CONCLUSION

For the reasons stated herein, Plaintiffs' Motion for Summary Judgment is DENIED in part and GRANTED in part. Plaintiffs' Motion to Certify the bail entitlement issue to the Iowa Supreme Court is GRANTED in accordance with Section C of this order. It, therefore, appears that

14. Naturally, the Court will wait to resolve this issue until such time as the Iowa Su-

the issues remaining for decision on the issues discussed herein are: 1) bail entitlement under Iowa law;[14] 2) what, if any, prospective injunctive relief may be ordered under the ADA; 3) what damages or relief are appropriate for the unlawful conditions of confinement and double jeopardy.

IT IS SO ORDERED

preme Court rules on the certified question.