Jordan **PRESS**, Plaintiff,

v.

**STATE UNIVERSITY OF NEW YORK AT STONY BROOK**, Defendants.

**No. 03 Civ.2070(ADS)(WDW).**

United States District Court, E.D. New York.

Sept. 27, 2005.

Scott Michael Mishkin, P.C. by Scott Michael Mishkin, Esq., Islandia, NY, for the Plaintiff.

Eliot Spitzer, Attorney General of the State of New York by Ralph Pernick, As-

sistant Attorney General, Mineola, NY, for the Defendants.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

The plaintiff Jordan Press ("Press" or the "Plaintiff") commenced this action against the State University of New York at Stony Brook ("Stony Brook" or the "Defendant"). The complaint alleges that Stony Brook violated Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.* ("Title II"), by discriminating against him because of his dyslexia disability.

Presently before the Court is a motion by the Defendant pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure ("Fed. R. Civ.P.") to dismiss this action for lack of subject matter jurisdiction. In the alternative, the Defendant moves for summary judgment pursuant to Fed.R.Civ.P. 56. In its Motion to Dismiss, Defendant argues that as an entity of the State, Stony Brook it is entitled to an Eleventh Amendment immunity defense. The Court agrees.

## I. BACKGROUND

During the relevant period, namely from 1999–2002, Press was an undergraduate student at Stony Brook. The Plaintiff suffers from mental impairments from dyslexia and dysgraphia, which substantially limit his ability to read and learn. The Plaintiff claims that he enrolled at Stony Brook partially due to the fact that it has a department called "Disability Support Services." ("DSS").

In or about the Fall 2001 semester, the Plaintiff enrolled in a pre-calculus course at Stony Brook in which he was granted a reasonable accommodation in the form of permission to use a more advanced graphing calculator for the course. During the Spring 2002 semester, the Plaintiff en-rolled in a calculus course, overseen by course coordinator Professor Claude Le-Brun ("LeBrun"). The Plaintiff assumed that he had permission to continue to use a graphing calculator in the course, and on his first mid-term exam. Upon learning that the Plaintiff used this type of calculator, LeBrun was "upset." The Plaintiff claims that the Math Department subsequently amended its policy to prohibit the use of graphing calculators "with the intent to cause him to fail the course." Am. Compl. ¶ 46.

Thereafter the Plaintiff claims that he obtained approval from Scott Sutherland ("Sutherland"), the Director of Undergraduate Mathematics, to use the graphing calculator on a future exam that was to occur on April 16, 2001. Again believing that he now had the requisite permission, the Plaintiff used a calculator on the April 16, 2001 exam. The Plaintiff was charged with academic dishonesty. According to the Plaintiff, LeBrun stated that he was "extremely suspicious" of the Plaintiff's claim that he had dyslexia, and that he believed the Plaintiff had created the disability. This incident allegedly caused the Plaintiff to experience mental duress. As a result, he sought treatment from a psychiatrist who prescribed medication to deal with the situation.

On or about April 22, 2002, the Plaintiff's Academic Dishonesty Hearing was conducted by a neutral officer, Executive Officer Maria Drueckhammer ("Drueckhammer"). This hearing was tape recorded. LeBrun, Sutherland, Donna Malloy ("Malloy"), a DSS representative, Plaintiff's attorney, several Stony Brook students, and another faculty member also attended the hearing. The Plaintiff claims Drueckhammer acted in a prejudicial manner towards him during the hearing. Upon receiving the tape recording of the Hearing, which Drueckhammer was charged with making, the Plaintiff discov-

ered that ten minutes had been erased. The Plaintiff claims that Drueckhammer's treatment of him was in retaliation for his reasonable accommodation requests and was motivated by discriminatory animus and ill will done with the intent to cause harm to him.

The Plaintiff received an "F" in the class. In addition, his transcript continues to indicate that a charge of academic dishonesty is pending decision by the Judiciary Board. As a result, the Plaintiff can no longer finish his career at Stony Brook, and cannot transfer to another school because of his record.

On April 30, 2003, the Plaintiff commenced this action against Stony Brook pursuant to Title II of the ADA. In addition to compensatory damages and attorney's fees and costs, the Plaintiff seeks the following relief: (1) that his student records be void of any wrongdoing; (2) that his transcript be amended to reflect a 4.0 grade point average; and (3) that he receive reimbursement of tuition and a waiver of his tuition for the remainder of his college career at Stony Brook.

## II. DISCUSSION

### A. Rule 12(b)(1) Standard

The Eleventh Amendment bars "federal jurisdiction over suits against nonconsenting States." *Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 73, 120 S.Ct. 631, 640, 145 L.Ed.2d 522 (2000) (citing *College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd.,* 527 U.S. 666, 669–670, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999)). Accordingly, a motion to dismiss on the ground of state immunity is a jurisdictional matter properly brought under Fed.R.Civ.P. 12(b)(1).

When considering a motion for lack of subject matter jurisdiction under Rule 12(b)(1), the Court may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional question. *Robinson v. Gov't of Malaysia,* 269 F.3d 133, 141 n. 6 (2d Cir.2001); *Antares Aircraft, L.P. v. Fed. Republic of Nigeria,* 948 F.2d 90, 96 (2d Cir.1991), vacated on other grounds, 505 U.S. 1215, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992); *Exch. Nat'l Bank of Chicago v. Touche Ross & Co.,* 544 F.2d 1126, 1130 (2d Cir. 1976). Under Rule 12(b)(1), the Court must accept as true all material factual allegations in the complaint, but will not draw inferences favorable to the party asserting jurisdiction. *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998); *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.,* 968 F.2d 196, 198 (2d Cir.1992).

### B. The Americans with Disabilities Act

The Americans with Disabilities Act (the "ADA") is a comprehensive statute that prohibits discrimination against individuals with disabilities. "It forbids discrimination against persons with disabilities in three major areas of public life: employment, which is covered by Title I of the statute; public services, programs, and activities, which are the subject of Title II; and public accommodations, which are covered by Title III." *See Tennessee v. Lane,* 541 U.S. 509, 516–17, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004). Specifically, Title II of the ADA ("Title II") provides that

no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity.

42 U.S.C. § 12132.

### C. Application of the Eleventh Amendment to Title II in the Context of a State's Alleged Denial of Access to Post–Secondary Education.

The Eleventh Amendment provides immunity against "any suit in law or

equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. 11. Although a state may consent to be sued in federal court with respect to a particular cause of action, a nonconsenting state is immune from suits brought by private individuals for money damages in federal court. *Board of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 364, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). However, the immunity of a nonconsenting state is not absolute, as a state's Eleventh Amendment immunity may be abrogated by Congress through legislation pursuant to its power under Section 5 of the Fourteenth Amendment ("Section 5"). Under Section 5, Congress has the power to "enforce the substantive guarantees of the Fourteenth Amendment." *Lane*, 541 U.S. at 518, 124 S.Ct. 1978 (citations omitted). Congress's Section 5 power "includes 'the authority both to remedy and to deter violation of the rights guaranteed [by the Fourteenth Amendment] by prohibiting a somewhat broader swath of conduct including that which is not itself forbidden by the Amendment's text.'" *Id.* quoting *Kimel v. Florida Bd. Of Regents*, 528 U.S. 62, 81, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000); *see also Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn, et al.*, 280 F.3d 98, 108 (2d Cir.2001).

With respect to the ADA, Congress stated:

[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter.

§ 12202.

■ To determine whether Congress's abrogation of a state's immunity is a valid exercise of power under section 5 of the Fourteenth Amendment ("Section 5"), a two prong test is applied: (1) Did Congress unequivocally state its desire to abrogate; and (2) was the abrogation "pursuant to a valid exercise of power." *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 55, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); *Garcia*, 280 F.3d at 108. As to the first element, with respect to the ADA, Congress unequivocally expressed its desire to abrogate State's immunity. Therefore the remaining question is whether Congress's abrogation of the state's immunity with respect to Title II in the context of access to education was done pursuant to a valid exercise of power. In this regard, a review of the relevant case law is required.

In *Garrett*, the Supreme Court considered whether the abrogation by Congress of the states' rights with respect to Title I of the ADA which prohibits discrimination in employment, was a valid exercise of power. The Supreme Court held that the application of Title I as against states was an invalid exercise of congressional power under Section 5. *Garrett*, 531 U.S. at 374, 121 S.Ct. 955. The Supreme Court found that the remedy imposed by Congress, namely Title I, was neither congruent nor proportional to the targeted violation in the form of denial of employment based on disability. Underlying this holding was the Supreme Court's determination that Congress failed to develop a sufficient record to support its finding that states had engaged in a pattern of unconstitutional discrimination against persons with disabilities in connection with employment. Thus, there was no basis for the enactment of remedial or preventative legislation under Section 5. *Id.* at 368, 121 S.Ct. 955; *see also Roe v. Johnson*, 334 F.Supp.2d 415, 421 (S.D.N.Y.2004). *Garrett* did not address the validity of Title II as it applies to the states.

After *Garrett,* the Second Circuit, in *Garcia,* addressed the second prong of the inquiry, namely whether "Title II is a valid exercise of Congress's § 5 power." *Garcia,* 280 F.3d at 108. The Second Circuit described Congress's power under § 5 as follows:

When operating under § 5, Congress may prohibit conduct that itself violates the Fourteenth Amendment's substantive guarantees. Congress may also remedy or deter violations of these guarantees by "prohibiting a somewhat broader swath of conduct" than is otherwise unconstitutional, *Garrett,* 121 S.Ct. at 963 (internal quotation marks and citations omitted), subject to the requirement that there be "congruence and proportionality between the [violation] to be prevented or remedied and the means adopted to that end." *City of Boerne,* 521 U.S. at 520, 117 S.Ct. 2157, 138 L.Ed.2d 624.

*Garcia,* 280 F.3d at 108. However, the Second Circuit also cautioned:

Congress may go no further, however, for to do so would work a substantive redefinition of the guarantees of the Fourteenth Amendment, and Congress "has been given [only] the power 'to enforce,' not the power to determine *what constitutes* a constitutional violation." *Kimel,* 528 U.S. at 81, 120 S.Ct. 631, 145 L.Ed.2d 522 (citations omitted).

*Id.* (emphasis added).

The Second Circuit found that "Title II in its entirety exceeds Congress's authority under § 5...." *Id.* at 110. However, the Court was able to bring Title II into compliance with Congress's § 5 authority by "[by] requir[ing] plaintiffs bringing such suits to establish that the Title II violation was motivated by discriminatory animus or ill will based on the plaintiff's disability." *Id.* at 111–112. This was the clear cut standard in the Second Circuit

until May 17, 2004, when the Supreme Court decided *Lane.* In the post-*Lane* era, Courts are divided as to whether the *Garcia* standard still applies to Title II cases against a state.

In *Lane,* a class of paraplegics alleged that Tennessee had denied them physical access to its courts in violation of Title II of the ADA. The Court explicitly declined to "examine the broad range of Title II's applications all at once," but rather only addressed the issue of "whether Congress had the power under § 5 to enforce the constitutional right of *access to the courts.*" *Lane,* 541 U.S. at 530–31, 124 S.Ct. at 1992–1993 (emphasis added). The Supreme Court stressed that the right of access to courts is "fundamental," *Lane,* 541 U.S. at 515, 124 S.Ct. 1978, and is among the "basic constitutional guarantees, infringements of which are subject to more searching judicial review [and is] protected by the Due Process Clause of the Fourteenth Amendment." *Id.* at 522, 124 S.Ct. 1978.

The Supreme Court also stated that prior to enacting this Title, Congress found a "sheer volume of evidence demonstrating the nature and extent of unconstitutional discrimination against persons with disabilities in the provision of public services." *Id.* at 1991. As such, the Court held that Congress's abrogation of Eleventh Amendment immunity with respect to access to courts is "a valid exercise of Congress's § 5 authority under the Fourteenth Amendment as applicable to cases implicating the fundamental right of access to the courts," *Lane,* 124 S.Ct. at 1993, because there was " 'a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.' " *Lane,* 541 U.S. at 520, 124 S.Ct. 1978 (citing *Boerne,* 521 U.S. at 520, 117 S.Ct. 2157). After *Lane,* the Second Circuit has not addressed the issue

of a state's immunity against a Title II claim in the context of public education.

The Defendant moves to dismiss this action on the basis that this Court does not have subject matter jurisdiction over this case. In particular, the Defendant contends that under *Lane,* in the context of access to post-secondary education, Title II is an invalid exercise of Congress's abrogation power under § 5. On the other hand, the Plaintiff claims that *Lane* has no bearing on the instant case because it is expressly limited to cases involving the fundamental right of access to the courts. As such, the Plaintiff claims that the law set forth in *Garcia* still applies and that he will prevail as long as he can establish that the Defendant acted with "discriminatory animus and ill will."

The Court notes there is a division in the Second Circuit with regard to the application of *Lane.* On the one hand, congruent with the Plaintiff's argument, there are cases holding that *Lane* only addressed the narrow issue of access to the courts, and that the "discriminatory animus" standard set forth in *Garcia* applies to all other Title II cases. *See, e.g., Sacca v. Buffalo State College, State Univ. of New York,* No. 01 Civ. 881, 2004 WL 2095458, at * 3 (W.D.N.Y.Sept. 20, 2004.) ("[t]he case of *Tennessee v. Lane* helps neither party because it specifically does not address Title II's applicability to any claim other than one for denial of access to the courts.").

Conversely, other cases have held that "in the wake of *Lane,* it appears that a private suit for money damages under Title II of the ADA may be maintained against a state only if the plaintiff can establish that the Title II violation involved a fundamental right." *Johnson v. Southern Connecticut State Univ.,* No. 02 Civ.2065, 2004 WL 2377225, at * 4 (D.Conn. Sept. 30, 2004); *see also Roe,* 334 F.Supp.2d at 421 n. 9 (In a case involving a claim of discrimination against persons with disabilities seeking admission to a state bar, it was stated that "[g]iven the Supreme Court's decision in [*Lane*] it would appear that there is no longer any basis to find the existence of a cause of action under Title II where no other fundamental right is implicated and the sole justification is the defendant's level of scienter.").

To determine whether Stony Brook enjoys immunity in this case, the Court must examine the analysis employed by the *Lane* Court. There, the Court applied the "congruence and proportionality" test set forth in *Boerne.* In order to establish whether Congress's enactment of Title II satisfies the *Boerne* "congruence and proportionality" requirements, the Court must determine (1) the constitutional right(s) that Congress sought to enforce when it enacted the ADA; (2) whether there was a history of unconstitutional discrimination to support Congress's determination that prophylactic legislation was necessary; and (3) whether Title II is an appropriate response to this history and pattern of unequal treatment.

With respect to the first prong, the *Lane* Court stated that the right of access to courts is a fundamental right stemming from the constitutional guarantees under the Due Process Clause of the Fourteenth Amendment and the Confrontation Clause of the Sixth Amendment. Such a fundamental right, "call[s] for a standard of judicial review at least as searching, and in some cases more searching, than the standard that applies to sex-based classifications." *Lane,* 541 U.S. at 530–531, 124 S.Ct. 1978.

■ However, the factual scenario here readily distinguishes this case. Unlike the fundamental right of access to the courts,

or any other right that is subject to heightened scrutiny, it is well-settled that access to education is not a constitutional or fundamental right. *Catlin v. Sobol,* 93 F.3d 1112, 1120 (2d Cir.1996) (applying rational basis review to case involving right to public education.); *Dunbar v. Hamden Bd. of Educ.,* 267 F.Supp.2d 178, 181 (D.Conn. 2003) (noting that education is not among the rights afforded explicit protection under our Federal Constitution); *see also Cady v. South Suburban College,* 310 F.Supp.2d 997 (N.D.Ill.2004) ("There is no general constitutional right to higher education.").

The second inquiry requires the Court to determine whether there was a history of unconstitutional discrimination to support Congress's determination that Title II was necessary. As referenced above, with respect to this prong and the right to access to the courts, the Supreme Court "developed a legislative record documenting a pattern of discrimination against persons with disabilities in the administration of public programs and services and heard specific evidence about their exclusion from courthouses and court proceedings." *Roe v. Johnson, Roe v. Johnson,* 334 F.Supp.2d 415, 422 (S.D.N.Y.2004) (citing *Lane,* 541 U.S. at 529, 124 S.Ct. 1978).

With respect to education, the *Lane* Court noted that Congress "document[ed] a pattern of unequal treatment in the administration of a wide range of public services, programs and activities, including ... public education ..." *Lane,* 541 U.S. at 530, 124 S.Ct. 1978. The Supreme Court also cited several examples of cases involving unequal treatment of disabled persons in the administration of education. Although the congressional findings do not appear to be as thorough as those relating to access to courts, arguably, Congress has documented a pattern of discrimination as to individuals with disabilities in education.

*Cochran v. Pinchak,* 401 F.3d 184, 191 (3d Cir.2005), vacated and rehearing granted on other grounds, 412 F.3d 500 (3d Cir. 2005) ("We are bound to [the Supreme Court's] conclusion as to step two").

The Court now turns to the third factor; whether Title II is an appropriate response to this history and pattern of unequal treatment. In *Lane,* the Supreme Court held that because access to courts is a fundamental right, and therefore afforded the highest level of protection and, Congress found that there has been a pattern of documented harm, the application of Title II to such cases satisfied the congruent and proportional test. To that end, the Supreme Court concluded that "Title II, as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment." *Lane,* 541 U.S. at 533–34, 124 S.Ct. 1978.

■ Unlike classifications involving race, alienage, and national origin, which mandate strict scrutiny review, or a gender based classification, which is subject to heightened scrutiny, the classification at issue here, namely disability, is only subject to rational basis review. The right to education is clearly not a fundamental right, *see San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 35–37, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (rejecting claim that education is a fundamental right, thereby triggering strict scrutiny review under the Equal Protection Clause), and a classification based on disability is not a suspect class. *See Story v. Green,* 978 F.2d 60, 64 (2d Cir.1992). Therefore, in the Court's view, the application of Title II to a case involving a states's alleged denial of access to post-secondary education on the basis of disability, is an abuse of the Section 5 power of Congress.

In the context of access to education in the post *Lane* era, the Court notes that at least one other court in this district is in accord. In *Johnson v. Southern Connecticut State University,* a post-*Lane* decision, the District of Connecticut was faced with the same issue as in this case. The *Johnson* Court concluded that "education is not a fundamental right for the purposes of Title II, and therefore, states continue to enjoy Eleventh Amendment immunity from suits for money damages." *Johnson v. Southern Connecticut State Univ.,* 2004 WL 2377225, at *4 (citing *McNulty v. Board of Educ. of Calvert County,* 2004 WL 1554401, at *3 (D. Md. July 8, 2004)) (Applying *Lane* and holding "that Eleventh Amendment immunity remains intact for education claims under Title II of the ADA."); *see also Buchanan v. Maine,* 377 F.Supp.2d 276, 278 (D.Me.2005) ("Stating that *Lane* does not extend to the non-fundamental, though important, rights protected by Title II . . . ").

The Court notes that the Fourth and Eleventh Circuits have extended *Lane* to cases involving access to education. *See Constantine v. Rectors and Visitors of George Mason Univ., et al.,* 411 F.3d 474, 490 (4th Cir.2005); *Assoc. for Disabled Amer., Inc. v. Florida Inter. Univ.,* 405 F.3d 954, 959 (11th Cir.2005); *But see Pace v. Bogalusa City School Bd.,* 403 F.3d 272, 287 (5th Cir.2005) (declining to address whether the holding in Lane extends to disability discrimination in access to public education.). Those courts held that even though the constitutional right to equality in education is not a fundamental right and is only subject to rational basis review, given the importance of education, relief under Title II is proportional and congruent to the alleged injury. *Id.*

The Court does not question the importance of equal access to education. *See Brown v. Board of Educ.,* 347 U.S. 483,

493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954).("[E]ducation is perhaps the most important function of state and local governments."). However, this Court is unwilling to expand the scope of Title II and encroach on the state's immunity with respect to a non-fundamental right such as access to post-secondary education that is subject only to rational review. *See Roe,* 334 F.Supp.2d at 423 ("In contrast to the situation confronted in *Lane,* the application of Title II to [applicants to a state bar], like Title I's general prohibition of employment discrimination, does not enforce basic constitutional guarantees whose violation would trigger a higher standard of judicial review"); *see also Cochran,* 401 F.3d at 193 (3d Cir.2005) (declining to extend Lane to Title II claims by disabled prison inmates).

In so ruling, the Court is reminded of the Second Circuit's warning that Congress "has been given [only] the power 'to enforce,' not the power to determine what constitutes a constitutional violation." *Garcia,* 280 F.3d at 108 (citing *College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 672, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999) ("[T]he term 'enforce' [in § 5] is to be taken seriously— . . . the object of valid § 5 legislation must be the carefully delimited remediation or prevention of *constitutional* violations.") (emphasis added)). Accordingly, the Defendant's motion to dismiss this action for lack of subject matter jurisdiction based on Eleventh Amendment immunity is granted.

### III. CONCLUSION

Based on the foregoing, it is hereby

**ORDERED,** that the Defendant's motion pursuant to Fed.R.Civ.P. 12(b)(1) based on Eleventh Amendment immunity is **GRANTED;** and it is further

**136**

ORDERED, that the complaint is dismissed in its entirety; and it is further

ORDERED, that the Clerk of the Court is directed to enter judgment in favor of the Defendant and against the Plaintiff; and it is further

ORDERED, that the Clerk of the Court is directed to close this case.

SO ORDERED.